UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Write the full name of each plaintiff.

ABRAHAM GROSS

-against-

THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT,
LOUISE CARROLL, ANNA-MARIE HENDRICKSON, MARAGERET BROWN, BABBA HALM, VICTOR HERNANDEZ,
SHATARA PELL, EDWIN LUGO, NIDIA DORMI, GABRIEL MOMBRUN, HAROLD WEINBERG,
NICK LUNDGREN, SAMANTHA SCHONFELD,
JAMES E. JOHNSON, HELEN ROSENTHAL,
BREAKING GROUND, JEANNE-MARIE WILLIAMS, BRENDA ROSEN, TERRESA PALMIERI,
VANESSA CUCURULO, STEPHANIE LABARTA and TRAVIS FONG.

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

**20-cv-4515**

(Include case number if one has been assigned)

**COMPLAINT**

Do you want a jury trial?
☑ Yes    ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☐   **Diversity of Citizenship**

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
**(a)The right for public officials with specific federal statutory fiduciary duties- who are mandated to protect the integrity of a public housing application process- to refrain from corrupting the process with criminal conduct.**

**(b)The right not to be discriminated against on the basis of race/ethnicity in public housing.**

**(c)The right not to be aggrieved by a criminal enterprise as contemplated by the RICO Act.**

**(d) The right not to denied of a valid property interest without due process of law.**

### B.   If you checked Diversity of Citizenship

#### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of

(Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of

                     (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____ .

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| **Abraham** | | **Gross** |
|---|---|---|
| First Name | Middle Initial | Last Name |

| **c/o Horwitz , 40 W 77 ST #10C** | | |
|---|---|---|
| Street Address | | |

| **NY** | NY<br>**NY** | 10024<br>**10024** |
|---|---|---|
| County, City | State | Zip Code |

| 917 673-1848<br>**917 673 1848** | **agross2@gmail.com** |
|---|---|
| Telephone Number | Email Address (if available) |

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

**THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, LOUISE CARROLL, ANNA-MARIE HENDRICKSON, MARAGERET BROWN, BABBA HALM, VICTOR HERNANDEZ, SHATARA PELL, EDWIN LUGO, NIDIA DORMI, GABRIEL MOMBRUN, HAROLD WEINBERG, NICK LUNDGREN, JAMES E. JOHNSON, HELEN ROSENTHAL, SAMANTHA SCHONFELD**

| First Name | Last Name |
|---|---|

**Please see Attached**

Current Job Title (or other identifying information)

**100 Church Street, NY, NY, 10007**

Current Work Address (or other address where defendant may be served)

| **NY** | **NY** | **10007** |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

**BREAKING GROUND (Non-For Profit for the Homeless population),  BRENDA ROSEN (CEO), TERRESA PALMIERI (Director of Leasing),VANESSA CUCURULO (Assistant Director of Leasing), STEPHANIE LABARTA (Senior Analyst) and TRAVIS FONG (intake specialist).**

| First Name | Last Name |
|---|---|

Current Job Title (or other identifying information)

505 8TH Avenue, 5th Floor

Current Work Address (or other address where defendant may be served)

| **NYC** | **NY** | **10018** |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

**JEANNE-MARIE WILLIAMS, ESQ.**

| First Name | Last Name |
|---|---|

**Partner at Kellner, Herlihy, Getty, and Friedman LLP**

Current Job Title (or other identifying information)

**470 SOUTH PARK AVE, NY, NY, 10016**

Current Work Address (or other address where defendant may be served)

| County, City | State | Zip Code |
|---|---|---|

Defendant 4:

_____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                        State                    Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:      **Plaintiff's grievance occurred in Manhattan**
**Defendants crimes pursuant to the RICO Act occurred in all five boroughs of New York City, Nevada, California, and Florida**

Date(s) of occurrence:      **July 2019- current. More damage is being inflicted every day.**

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

**Your Honors. Everything that follows is written with humility and respect. Please understand that as horrific as the following may seem, every assertion herein is substantiated by a mountain of irrefutable evidence, in the form of official city records, NYC regulations, and written admissions.**

**In short, I have been applying to affordable housing for ten (10) years, to no avail. In ten years, I never received a lottery number favorable enough to pass the initial lottery phase. The Manhattan subject property, Waterline Square, was the first and only time I was granted an interview.**

**In January 2019, for the first time in ten years, I received a favorable lottery number that-pending the income vetting phaze- guaranteed him an apartment. Out of 74,000 applicants, I was given a priority log number of #103. Between March 05-June 07, 2019, I furnished hundreds of financial documents that were requested in eight (8) separate requests. All together, I furnished over 350 documents that were throughly evaluated.  During this time, I was subjected to Respondent associate's admittedly-unlawful conduct, who took active measures to guarantee my application would be rejected. Nevertheless, I past all 8 rounds of due diligence.**
**On June 07, 2019, I was notified that I passed the vetting, and would be coming to see an apartment and sign a lease the following week.**
**At that point, I respectfully asked to be transferred to another associate. In immediate response, the associate issued an unlawful-per se-rejection, based on the unauthorized grounds of unspecified inconsistent information. To date, this first rejection is one of countless puzzles that remain unexplained by the Respondents. The truth- respectfully, one of many that the Court ignored- is that once that first rejection is issued, the applicant is doomed.**
**No matter how baseless, both Respondents will stop at nothing to affirm the original determination, even if they have to discover novel justifications to reject the affordable housing applicant. We know this for three reasons: (a) HPD's spokesperson shared this fact with an investigative journalist, who authored a paper illustrating the stomach-turning injustice inflicted on millions of affordable housing applicants; (b) due to the dismal number of determination reversals; (c) alas, it is also rational: rather than exposing an arbitrary and capricious determination, Respondents are motivated to appear competent by discovering new post-facto justifications that gives credence to a baseless rejection.**

**From June 10, 2019- July 09, 2019, I was rejected four times based on a shifting array of reasons that expressly unlawful based on statutory provisions, conflicting and erroneous methods of calculations, and glaring mathematical errors. These errors remain unexplained, despite countless attempts to ask Respondents to explain why they computed my income without regard to the actual numbers stated in my application, or the actual method of calculation stated in the regulatory agreement, but instead with a clear malicious intent to uphold the initial rejection.**

**On September 23, 2019, Respondents unfathomable conduct forced me into a public shelter. Prior to this devastating event, I begged the Court and Respondents to recognize the travesty, but hit a vicious wall of indifference.**
**Pursuant to prolonged homelessness, inhuman levels of stress, deterioration of physical and mental health, loss of employment, depleted life-savings, emotional trauma, anxiety, sleep deprivation, lack of necessities, exposure to violence and drug abuse in shelters, isolation from family and friends, and hellish holidays in isolation, I am now attempting to not die from the coronavirus in a state of homelessness, while Respondents sickening fraud continues to prosper.**

**Officially, the narrative of Defendants advance is that I was rejected from affordable housing based on the evaluation of my income.**
**This disgraceful lie is refuted by a tsunami of refuting evidence, including glaring mathematics errors,**
**admissions in recorded audio conversations, sworn affidavits of whistleblower employees, and incriminating emails from the decision-makers obtained through the Freedom of Information Law ("FOIL").**

This irrefutable evidence proves that: I was rejected for two simple reasons: (a) my ethnicity (b) the insatiable greed of public officials who steal millions of dollars worth of affordable housing real-estate, even as these words are written.

Your Honors, NYC housing agencies have access to hundreds of emergency housing units designated for emergencies such as a global pandemic. But instead of helping the homeless population find temporary shelter in these apartments, the housing agencies keep them empty, thereby, increasing the inventory of affordable real estate that they can transfer to themselves, family, and friends. Notwithstanding that it is perverted for government officials to steal affordable housing from homeless people at increased risk, this is the reality proven by a trove of official city records.

Your Honors, what I endured is by no means limited to me. It impacts millions of New Yorkers, well-deserving applicants, who after winning the affordable housing lottery, matching the income requirements, and qualifying a rigorous vetting process, are cheated from affordable housing, solely due to their skin color or ethnicity. In other cases, they are cheated because apartments for which they qualified are embezzled by public officials at various NYC agencies.

Respectfully, the horrifying truth is that I am enduring these inexpressible hardships, despite the following:

(a) For obvious reasons- to include unsanitary conditions and a weaker immune due to the stress of being homeless since September 23, 2019, my chances of survival are exponentially lower in my current state of homelessness.

(b) By executive order, evictions across New York State have halted. In doing so, the New York executive branch has demonstrated compassion for people who would otherwise be homeless during a pandemic. In contrast, Respondents conduct is indifferent to this initiative.

(c) Respondents having authority to utilize vacant apartments for emergency situations, as evident from the Official HPD Handbook (page 40).

(d) The credible evidence demonstrates that each and every of the key decision-makers of the Respondents who denied me the single affordable housing opportunity I qualified for in ten (10) painful years of efforts, are active participants in the Scam.

(e) I am a valid referral from the Department of Homelessness Services ("DHS"), and based on Respondents own rules, referrals from DHS are exempt from the minimum income requirement, th[e] [g]rounds for rejection. Thus, even if everything they argued was true, even if all the violations of law, mathematical errors, bad faith, 750 credit score, bank's offer to loan me the entire first year of ren[t] [i]s based on Respondents own rules regarding referrals from DHS (which I am).

(f) Defendants announcing on May 30, 2020, that the rejected 99% of the applicants, and that 22 apartments still remain, while public records show the majority of these apartments were awarded to unqualified applicants, of hispanic ethnicity that live in other affordable properties.

(g) Defendant Breaking Ground's website states: "our mission is to strengthen individuals, families and communities by developing and sustaining exceptional supportive and affordable housing as well as programs for homeless and other vulnerable New Yorkers".

"At Breaking Ground, home is a support system. We provide a full spectrum of wraparound supports that help people recover from the trauma of homelessness, achieve stability, and rebuild their lives in housing".

(h) And Defendant HPD released the following to the press around May 10: "We are pleased to introduc[e] new changes to the Housing Connect lottery process, aimed at moving New Yorkers into stable, affordabl[e] housing as quickly as possible, during the COVID crisis and beyond".

Respectfully, absent the immediate and compassionate response of a public official of integrity, this travesty will shortly become a tragedy. Nothing short of evil corruption will prevail.

# INJURY:

Deprivation of civil and constitutional rights, deprivation of a valid property interest without due process of law, prolonged homelessness (Since September 23, 2019), inhuman levels of stress, deterioration of physical and mental health, loss of employment, depleted life-savings, emotional trauma, anxiety, sleep deprivation, lack of necessities, exposure to violence and drug abuse in shelters, isolation from family and friends, and hellish holidays in isolation, loss of property.

# RELIEF:

—Limited relief to escape the deadly threat of the coronavirus, based on the merits and the compelling evidence of an inexpressible miscarriage of justice.
—Award of damages, according to proof, including treble and liquidated damages, to be paid by Defendants, in an amount to be determined at trial.
—In light of the discovery of irrefutable evidence that this dispute involves federal question of blatant discrimination based on race, and in light of clear of convincing evidence Defendants corrupted the judicial process, and in light of the most recent development (June 6, 2020), where Part 56 abruptly ordered this proceeding to be transferred to another judicial part, may the Honroble Court use its authority to transfer the related state proceeding case number Sup Crt. 101960/2019 to Fed. court.
—As an equitable remedy for the sickening ways Plaintiff's basic rights for due process of law were set aside in State proceedings, time and time again, may the Honorable Court consider hiring a pro bono attorney in some capacity.
—Due to the sickening breach of administrative integrity of top NYC public officials and the corruption of the judicial process, may the Honorable Court consider ordering an investigation from a non-compromised federal investigative agency that has no ties or affiliation to the practice of transferring Properties for free.
—Any further legal and equitable relief that the Honorable Court deems appropriate and just.

Please don't disregard a sickening travesty that has destroyed, and is now threatening to kill the life of a law-abiding, homeless, affordable housing pro se litigant.
Your Honors. Thank you so much for time and consideration of this matter.

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 06/09/20 | |
| --- | --- |
| Dated | Plaintiff's Signature |
| Abraham | Gross |
| First Name          Middle Initial | Last Name |

**40 w 77 St. #10C, NY, NY 10024**

Street Address

| County, City | State | Zip Code |
| --- | --- | --- |
| 917 673 1848 | | agross2@gmail.com |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes    ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

ABRAHAM GROSS,

        Plaintiff,

                                  **COMPLAINT**
                                  **CIVIL ACTION NO.**
                                  **JURY TRIAL REQUESTED**

        -against-

THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT, LOUISE CARROLL,
ANNA-MARIE HENDRICKSON, MARAGERET BROWN, BABBA HALM,
VICTOR HERNANDEZ, SHATARA PELL, EDWIN LUGO, NIDIA DORMI,
GABRIEL MOMBRUN, HAROLD WEINBERG, NICK LUNDGREN,
SAMANTHA SCHONFELD, JAMES E. JOHNSON, HELEN ROSENTHAL,
BREAKING GROUND, JEANNE-MARIE WILLIAMS, BRENDA ROSEN,
TERRESA PALMIERI, VANESSA CUCURULO, STEPHANIE LABARTA and
TRAVIS FONG.
                      Defendants.
_____x

## <u>NATURE OF THE ACTION</u>

1. I, Abraham Gross ("Plaintiff"), as an aggrieved pro se litigant, bring this

   action to redress the catastrophic harm inflicted as result of Defendants

   flabbergasting deprivation of rights secured by the Civil Rights Act of 1871,

   *42 U.S.C. § 1981* ("Section 1981"), Title VIII of the Civil Rights Act of

   1968 Fair Housing Act, *42 U.S.C. §§ 3601-19* ("Title VIII")*,* Title VI of the

Civil Rights Act of 1964 (nondiscrimination in federally assisted programs), *42 U.S.C. § 2000d-1* ("Title VI"), Article XVII of the New York State Constitution ("Article XVII")[1], the 14th Amendment of the U.S. Constitution "14th Amendment")[2], Title 24 of the Code of Federal Regulations Discriminatory Conduct Under the Fair Housing Act ("Title 24"), Executive Order 11063 (November 20, 1962) prohibiting discrimination in the rental of properties provided with federal funds ("Order 11063"), Executive Order 12898 (February 11, 1994), requiring federal agency programs to avoid discrimination in conducting activities that substantially affect public health ("Order 12898"), the New York State Human Rights Law as contained in New York State Executive Law § 296 ("NYSHRL"), the New York City Human Rights Law as contained in the Administrative Code of the City of New York § 8-107 ("NYCHRL"), and the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§

---

[1] "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions".

[2] "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

1961-1968 ("RICO"). Hereinafter, the aforesaid statutes are orders will collectively be referred to as the "Protective Regulations[3]".

## JURISDICTION AND VENUE

2.  The United States District Court for the Southern District of New York ("the Honorable Court") has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state and city causes of action. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because of the location of the subject property, Waterline Square, as well as the result of the aforesaid deprivations, occurring in the Southern District of New York.

## GENERAL ALLEGATIONS

3.  The Plaintiff[4] alleges as follows:

---

[3] Granted the opportunity, Plaintiff will present this Honorable Court with clear and convincing evidence that (a) Defendants constitute an enterprise engaged, *inter alia,* in (b) embezzlement, bribery of public officials, wire fraud, obstruction of justice, alteration of official records, perjury, and racially-discriminatory housing practices; (c) that the alleged conduct is sufficiently pervasive to establish a pattern (d) involves state and federal property (e) continues even as these words are written. The evidence will include thousands of public records including property transfer deeds, sworn testimonies of former employees, court records, official email correspondence, and Defendants inadvertent written admissions.

[4] Please kindly note that in certain sections of the supporting exhibits, the Plaintiff will also be referred to as "I", "the Appellant", or "the Petitioner", and the Defendants as "Respondents".

4. That the aforesaid Defendants, acting in official capacity on behalf of the City of New York and affiliated agencies such as the Department of Housing Preservation and Development ("HPD"), Office of the Mayor ("City Hall"), NYC Law Department ("Corporation Counsel"), and publicly-funded, Non-For-Profit organizations such as Defendant Breaking Ground ("BG"), methodically violated the Protective Regulations.

5. That as a direct and proximate result of these violations, Plaintiff (as well as countless other affordable-housing applicants) endured and continues to endure- unfathomable harm, including but not limited to prolonged homelessness[5], monetary damages, humiliation, emotional trauma, and indescribable suffering.

6. That Plaintiff was and still is deprived of the apartment he rightfully qualified for in June 2019, and for which he was promised to sign a lease after an unconscionable application process that highlighted Defendants systemic contempt for statutory obligations, pursuant to the Protective Regulations.

7. That the Defendants cruel and unusual conduct is demonstrative of a callous disregard for Plaintiff's life, as he continues to struggle not to die from the

---

[5] See EXHIBITS A_0.

coronavirus, while facing unsafe living conditions, pursuant to 265 days of unjustified homelessness torment, while twenty-two (22) apartments for which he is eligible- stand vacant.

8.   That by clear and convincing evidence[6], Defendants and their co-conspirators have turned New York City's affordable-housing lottery process ("the Process") into a get-rich criminal enterprise ("the Scam") that is motivated by (a) a racially-discriminatory selection process, featuring a by-default rejection of all qualified non-hispanic applicants, and blanket approval of all unqualified hispanic applicants (b) insatiable greed of public officials sworn to protect the integrity of the Process.

9.  That as part of the Scam, hundreds of millions of dollars of affordable-housing properties ("Properties", or "Property") designated for low income applicants, are instead embezzled, transferred, granted-for-free, or for nominal value to the Defendants, family and friends of the Defendants, other unqualified Hispanic applicants, business associates of the Defendants, NYC agency executives, council members, police officers, trial

---

[6] 344 incriminating documents that provide a glimpse into the thousands of pages of irrefutable, supporting evidence are available on the NYSCEF, E-File platform, Appellate Division, Case Number, 2019-04206, Docket #9, pages 71-415, EXHIBITS B-H.

judges, appellate judges, court employees, politicians, and others (hereinafter: "Privileged Parties").

10. That instead of protecting the integrity of the Process, a trove of official city transfer deeds demonstrates that the Process is, in fact, a sophisticated Scam.

11. That by clear and convincing evidence, the corrupt methods employed by Defendants include the bribery of oversight agencies with free transfers of Properties, intimidation, retaliation and physical violence against whistleblowing employees[7]. Coupled with the crimes stated in footnote (3), these will collectively be referred to as "Criminal Conduct".

12. That upon Plaintiff submitting to the Court incriminating evidence on February 03, 2020, proving, *inter alia,* the fraudulent transfer of Properties through the fictitious straw parties, such as, Meah Lovely, Meah Lovely T, Nader Ahmed, and Ahmed Nader[8], Defendants abused their authority by logging in to official city payroll databases, and deleting these profiles[9].

13. That upon Plaintiff protesting the alteration of official records, the deleted employee profiles were instantly restored.

---

[7] Two examples from a longer list are found in EXHIBIT A, EXHIBIT B herein, and in NYSCEF, Appl. Div., Docket #9.

[8] See EXHIBIT C herein, and NYSCEF Appl. Div., Docket #9, 04206, EXHIBIT B-E.

[9] EXHIBIT C herein.

14. That by clear and convincing evidence, in immediate response to Plaintiff submitting such incriminating evidence to the Court, multiple judges (trial and appellate) and court attorneys that decided Plaintiff's case, released property interests that were unlawfully obtained (for example, simultaneously residings in multiple rent-stabilized apartments), and which were held onto- in some cases- for over thirty-five years.

15. That simultaneously with the release of these interests, the Court proceeded to issue, on its own motion, a draconian gag order which, *inter alia,* barred Plaintiff from submitting any further such evidence, while setting aside the well-established percent and due process.

16. That by clear and convincing evidence, in immediate response to Plaintiff submitting such incriminating evidence to the Court, the HPD project manager of the subject property (Waterline Square), Defendant Mombrun, released his embezzled property interest in the luxury, Brooklyn-based, affordable-housing Property, 'The Hub'.

17. That by clear and convincing evidence[10], the Scam has flourished for so long due to the active participation of designated employees within public agencies, such as City Hall, Corporation Counsel, and the Department of

---

[10] Examples are within EXHIBIT E herein. It is noted that both the Manhattan D.A. concluded that these "fake bids" were unlawful.

Investigations ("DOI"), and others. For example, City Hall and Corporation Counsel actively participated in the Scam by falsely swearing that an open bid was held for a specific Property, and that the Property was awarded to the highest bidder, despite no such bid ever being held, and the property being awarded to Privileged Parties for a fraction of its value (million dollar properties were awarded for sums ranging from $250-$2250).

18. As another illustration, official city records demonstrate that Defendants provided numerous NYC judges and court attorneys for free, or for below-market-value, affordable housing Properties. In other cases, NYC judges and/or court attorneys resided simultaneously in multiple rent-stabilized apartments, which violates NYC housing regulations. In exchange, cases involving various city agencies were assigned to "favorable courts", who consistently ruled in favor of the agency, regardless of how outrageous the agency acted.

19. This assertion is supported by the fact that the random assignment of cases- a crucial aspect of protecting judicial impartiality- was corrupted. For example, the calendar of the Honorable part 56 ("the Court") shows statistically-impossible anomalies, in comparison to any other part[11].

---

[11] The Court's calendar proves that at a given point five-month period in 2019, the Court was assigned twenty-five (25) times more cases involving pro se litigants (1 vs. the average of 25),

20. The fact that public records show Defendants awarded dozens of affordable Waterline Square Properties to a flurry of unqualified applicants of hispanic ethnicity, whose income far exceeds the limits, and who reside in multiple affordable Properties simultaneously- substantially supports the nucleus of this complaint.

21. The Defendants stunning press release on May 30, 2020, which claimed- in effect- that the Defendants had disqualified 73,753 applicants out of 74,000 applicants to Waterline Square as ineligible applicants, and that as result of disqualfying 99% of the application pool, 22 apartments remained vacant- substantially supports the nucleus of this complaint.

22. That while the nature and scope of such Criminal Conduct is shocking, it nevertheless is corroborated by credible evidence from independent sources, and calls for uncompromising intervention.

## ADDITIONAL RELEVANT PROVISIONS OF LAW

23. ***New York City Zoning Resolution Inclusionary Housing:*** Under the Inclusionary Housing Program, as set forth in Section 23-90 of the New

---

nine (9) times more cases involving city agencies (39 vs. the average of 4), and eight (8) times more special proceedings (35 vs. the average of 4). Exacerbating the egregious nature of this discrepancy is the fact this anomaly occurred despite the Court itself being classified as a trial court, and the existence of agency-specific parts. Furthermore, the unbearable- if undisputed- fact is that pursuant to this statically-anomaly being protested by Plaintiff, the discrepancy was "magically adjusted".

York City Zoning Resolution, in return for agreeing to keep developed

Properties permanently affordable, the owners receive a bonus in the form of

additional developable floor. Such owners enter into a regulatory agreement

with HPD that requires compliance with all applicable provisions.

24. ***The HPD Marketing Handbook****:* In 2018, HPD published the "Marketing

Handbook: Policies and Procedures for Resident Selection and Occupancy"

("the Handbook"), which contains the general policies, procedures, and

requirements for the marketing and selection of residents for developments

assisted by HPD. *On page 70, the Handbook incorporates all applicable*

*Federal and State laws into the Handbook.*

25. ***The Regulatory Agreement Between HPD and BG*** ("the Regulatory

Agreement")*: Provides the specific binding provisions of the subject

property, Waterline Square ("the Subject Property"), such as under what

grounds an applicant can be rejected, and the way of computing an

applicant's income. It also includes the BG/HPD "Summary Plan".

26. ***The Applicant Income Calculation Guide*** ("the Income Guide"), published

by HPD, illustrates the income calculation method that HPD and BG *should*

*take into consideration* when evaluating an applicant's income.

## **THE PARTIES/PERTINENT FACTS**

27. Plaintiff is a law-abiding, New York resident, who has been applying to affordable housing for the past ten years, to no avail. In November 2018, Plaintiff applied to the Subject Property- an affordable-housing project that matched Plaintiff's income. The Process for the Subject Property was supervised and managed by HPD and BG. On March 05, 2019, pursuant to winning the housing lottery for the first time (Plaintiff's priority number was #103 out of #74,000 applicants), Plaintiff was called in for his first and only interview in ten years of applications. Between March 05, 2018-June 07, 2019, Plaintiff successfully passed eight (8) additional rounds of due diligence, providing Defendants with hundreds of requested documents in a timely manner. On June 07, 2019, after undergoing a Process that featured utter disregard for lawful procedure, Defendant Travis Fong of BG ("Fong"), notified Plaintiff that his application was approved, and that he would be coming to sign a lease on the week of June 10, 2019. Thereafter, upon merely asking for his file to be transferred to another associate- in light of Fong's sickening attempts to sabotage his application- Plaintiff was instantly  rejected without any justifiable cause, based on an arbitrary cause that is specifically prohibited by the Regulatory Agreement and the Summary Plan, "unspecified inconsistent information". Worse yet, based on

Defendants own admission[12], once a first rejection is issued, the odds of reversal are dismal, regardless of how unlawful or egregious the first rejection. This admission is also supported by the logical conclusion that BG is motivated not to have their associates who issued an unlawful rejection seem as though they are clueless about the rules governing fundamental aspects of the Process.

28. Thereafter, Plaintiff was rejected for a total of four times based on a shifting array of reasons (some of which were unlawful-per-se), disparate income calculations, and bewildering mathematical conclusions that remain unexplained, and which are inconsistent with the supporting income documentation Plaintiff provided four months prior[13]. Furthemore, based on credible affidavits of employees with first-hand knowledge, Plaintiff was rejected solely (a) because of his race (b) the vested interests of the decision-makers, who reject as many qualified applicants as possible, such that more Properties can be embezzled for themselves, family, friends, and the other Scam perpetrators. Plaintiff's address for service of process is: C/o Horwitz, 40 West 77 St, #10C, New York, New York, 10024 (although

---

[12] Docket # 9, NYSCEF, Appl. Div. 2019-04206, EXHIBITS A3-A4.
[13] see Dockets # 27, NYSCEF, Appl. Div. 2019-04206, pages 194-232; and Dockets # 9, NYSCEF, Appl. Div. 2019-04206, pages 1-74.

Plaintiff does not live there, pursuant to being forced into homeless on September 23, 2019).

29. Defendant the City of New York ("City") is a municipal agency existing by virtue of the laws of the State that employed Defendants #2-#15 through City agencies, including: HPD, City Hall, Corporation Counsel, and the City Council. Based on Defendants correspondence evidence, the Defendants had direct knowledge of Plaintiff's housing application, and were active participants in the original rejection, or in subsequent rejections of remedial efforts of entities, such as Office of the NYC Public Advocate, Volunteers for America, and Churches United for Fair Housing.

30. Defendant HPD is a mayoral agency of Defendant City, established pursuant to Chapter 61 of the City Charter, which specifies HPD's powers as functions relating to the rehabilitation, maintenance, alteration and improvement of city-housing developments.

31. The following Defendants are sued in their official and individual capacity, pursuant to violations of the Protective Statutes, and breach of fiduciary and statutory duties to ensure a fair Process[14]:

---

[14] Page 5 of the HPD Affordable Housing Marketing Handbook ("the Handbook").

32. Defendant LOUISE CARROLL ("Carroll") is the Commissioner of HPD.

Based on public records, Defendant Carroll has lived for twenty-five years

in a low-income, City-owned, public housing complex, located on the Lower

East Side (RIIS 2). Upon information and belief, Caroll's annual salary of

over $220,000 disqualifies her from low-income housing. HPD is a

constituent agency of the City of New York with its principal place of

business at 100 Gold Street, NY, NY, 10038.

33. Defendant ANNA-MARIE HENDRICKSON ("Henrdrickson") is the

Deputy Commissioner of HPD. Based on public records, for nineteen (19)

years, Defendant Hendrickson lived simultaneously in multiple

rent-stabilized Properties in Brooklyn. Furthermore, in 2018, Defendant

Hendrickson was accused by a whistle-blowing HPD employee, Mr. Ricarte

Echevarria ("Echevarria"), of forcing him to grant affordable-housing to an

out-of-state relative who was ineligible on multiple grounds (EXHIBIT A).

When Echevarria protested to Defendant Hendrickson's supervisor, the

supervisor admitted to Echevarria that "she hated when Defendant

Henderson did stuff like that", but nevertheless proceeded to unlawfully

award the apartment. When Echevarria further protested to DOI, he was

threatened, instructed to delete incriminating information, and eventually fired. DOI took no disciplinary action against Defendant Hendrickson.

34. Critically, HPD rushed to settle this case and pay off Echevarria prior to the discovery phase. Although a general rule[15], prior settlements are not used to prove liability or invalidity of a claim, it is well-established such evidence is "otherwise discoverable"[16], and is not required to be excluded "solely because" it was presented during the course of compromise negotiations[17]. Further, admissibility of such evidence is not limited "when it is offered for another purpose[18]", such as to prove: (1) an existing racial bias (2) credibility of the decision-maker or witness (3) the decision maker was on notice to refrain from their prior misconduct[19] or (4) acted in bad faith[20].

---

[15] CPLR §4547, "Compromise and offers to compromise".

[16] Practice Commentaries, McKinney's Cons. Laws of New York Annotated, Book 7B, CPLR 4547, Supp. at p. 96.

[17] Ibid, ibid.

[18] Lyondell Chemical Co. v. Occidental Petroleum Corp. U.S. Court of Appeals, 608 F.3d 284 (5th Cir. 2010). As stated, Page 70 of the Handbook specifically incorporates all relevant federal laws.

[19] Practice Commentaries, McKinney's Cons. Laws of New York Annotated, Book 7B, CPLR 4547, Supp. at p. 97. *United States Vs. Austin 54 F.3d 394, 400 (7th Cir. 1995).*

[20] *Towerridge Inc. V. T.A.O. Inc.11 F.3d 758, 770 (10th Cir. 1997).*

35.  Adding credence to Defendants culture of corruption is that in 2019, Defendant Hendrikson was fined $6,000 by the Committee of Conflicts Board for taking illegal gifts in the form of tickets to a sporting event[21].

36. Defendants MARAGERET BROWN ("Brown") and BABBA HALM ("Halm") are Deputy Commissioners at HPD. Based on public records, they both live or lived simultaneously in multiple rent-stabilized Properties.

37. VICTOR HERNANDEZ ("Hernandez") is the Director of Affordable Housing and Affordability Oversight at HPD. Based on public records, Hernandez has been involved in seven-three (73) unlawful transactions[22]. Furthermore, Hernandez, as confirmed by the Department of Investigations ("DOI") is currently living, simultaneously, in three affordable-housing apartments for low-income applicants. Hernandez's annual salary is over $120,000- above the maximum permitted. Moreover, HPD's own rules (page 42 of the Handbook), bar any employee participating in affordable lotteries, let alone the Director of the HPD Affordable Housing Division.

38. Pursuant to an initial investigation by the DOI, it was permissible for Hernandez to have acquired these three affordable Properties without paying

---

[21]https://www.nydailynews.com/new-york/ny-housing-preservation-hpd-hendrickson-yankees-nets-tickets-20191008-skfxw4sfizdwjaoprw46vs4aum-story.html
[22] Illustrations in 2019-04206, Docket #9, NYSCEF, EXHIBITS B.

any compensation. Upon Plaintiff's protest, and the request of the Manhattan

District Attorney for a second investigation, the DOI rescinded its prior

determination, and concluded Hernandez in fact acquired these properties in

violation of HPD housing regulations. DOI is reportedly collecting further

evidence as part of a broader criminal investigation. In a peculiar

development, the DOI now claims that Hernandez has abruptly retired from

HPD- despite being an active participant in Plaintiff's rejection.

39. In 2018, another HPD whistleblower, Karina Rodriguez, revealed in a

sworn complaint that HPD's policy is to discriminate against any

non-hispanic affordable housing applicant. Plaintiff is a non-hispanic person.

This horrific revelation was confirmed by two other former employees with

first hand-knowledge, who are eager to testify in a court of law as to the

atrocious discrimination policies. Ms. Rodriguez further accused Defendants

Hernandez, Hendrickson and Defendant SHATARA PELL ("Pell") of

intimidation, retaliation, age-based discrimnation, abusive conduct and

violence (EXHIBIT B). As with Mr. Echeveria, HPD rushed to settle this

case before discovery.

40. Pursuant to extensive research, Ms. Rodriguez's assertion regarding HPD's

racial discrimatnion against non-hispanic, affordable-housing applicants is

supported by the outrageously-disportionate number of Properties granted to hispanic applicants, and the outrageously-disportionate number of rejected non-hispanic applicants. The extraordinary disparity is even stronger when evaluating new-construction Properties.

41. Defendants EDWIN LUGO ("Lugo") and NIDIA DORMI ("Dormi"), and GABRIEL MOMBRUN ("Mombrun"), are also HPD employees that were active participants in unlawful discrimiantion and in the Scam[23]. Per the determination of DOI, Defendant LUGO embezzled multiple Properties in the Bronx, while Defendant Mombrun operated in Brooklyn[24].

42. Defendants HAROLD WEINBERG ("Weinberg"), NICK LUNDGREN ("Lundgren") and SAMANTHA SCHONFELD ("Schonfeld"), are lawyers working for HPD or for HPD on behalf of the City, who have are active participants in the Scam. For example, they are well-aware of HPD's racial discmination against non-hispanic applicants.

43. Defendant Breaking Ground ("BG") is a Not-For-Profit entity mandated to determine the eligibility of applicants to the Property based on applicable

---

[23] This assumes Nidia Dormi is a real HPD employee using her real name. Public payroll records show that Ms. Dormi started working at HPD only in 2019, with a starting salary of 78k. None one of the fourteen (14) public directories list a person named Nidia Dormi or anything close. There is not a single reference to such a person on any social media platform, nor on any birth certificate or death record database.
[24]  Illustrations in 2019-04206, Docket #9, EXHIBITS C-H.

laws. In this capacity, BG is performing the traditional-state-function of eligibility evaluation for public housing.

44. Irrefutable evidence is demonstrative of BG's active participation in the racial discrimination, disregard for statutory obligations and continual deprivation of Plaintiff's rights. BG is incorporated under the laws of the State of New York, with its principal place of business located at 505 8th Avenue, 5th Floor, NY, NY 10018.

45. Defendant Brenda Rosen ("Rosen"), is the current CEO of BG, who is also yet another affordable-housing mogul with five affordable property interests, while living simultaneously in multiple rent stabilized apartments.

46. Defendant Terasa Palmieri ("Palmieri"), current Director of Leasing at BG, Defendant Vanessa Cucurullo ("Cucurullo"), current Assistant Director of Leasing at BG, issued Plaintiff's 3rd rejection, Defendant Stephanie Labarta ("Labarta"), senior analyst at BG, issued Plaintiff's 2nd rejection. Defendant Travis Fong ("Fong"), intake specialist at BG, issued Plaintiff's 1st rejection. All of them are active participants in racial discrimination and the Scam, and disregard for numerous statutory obligations. Defendant Jeanne Marie Williams ("Williams") is an attorney for BG, who has actively participated in the Scam, *and inter alia*, refused to report the criminal

conduct of her clients, despite being given numerous incriminating documents. She is a partner at the law firm, Kellner, Herlihy, Getty, and Friedman, with an address at 470 Park Avenue South, NY, NY, 10016.

47. Defendant Helen Rosenthaul ("Rosenthal") is the New York councilmember for the Property (6th District). Her address is 250 Broadway Suite 1744, New York, NY 10007.

48. In July 2019, pursuant to a fourth cryptic determination which concluded Plaintiff's self-employment income was $0 (despite 300 documents to the contrary), Plaintiff turned to Defendant Rosenthal in her official capacity. Initially, upon an employee in her office, Ms. Vivian Riviera, thoroughly reviewing Plaintiff's supporting documents and concluding the rejections were in fact cryptic and outrageous (worse yet, Ms. Riviera attested to fact that she has seen dozens of cases with similar misconduct from BG and HPD), Defendant Rosenthual vowed to do what any reasonable constituent would expect- ask HPD and BG to explain their conclusory numbers that are refuted by the record.

49. Thereafter, a dramatic shift occurred. Defendant Rosenthual terminated all communication. Her staff scheduled a follow-up conference call on Friday, which she never made. She ignored emails and messages from Plaintiff.

50. Prior to being forced into a shelter on September 23, 2019, Plaintiff attempted to reach out one last time to his council member. Defendant Rosenthaul refused to speak to Plaintiff, despite being in the office. Instead, she instructed her Chief of Staff, Ms. Marissa Mack (per the account of Ms. Mack) to tell Plaintiff that "the best thing for you to do is go into public shelter. HPD can't help you.". No explanation was offered as to why HPD continued to violate the law requiring them to provide a specific and detailed reason for rejection, or other violations of law.

51. The sudden change of heart of Defendant Rosenthal became abundantly clear when an investigative journalist for a major publication showed Plaintiff proof that at the very same time Defendant Rosenthual abruptly severed all communication and backed out of her promise to help, she also became the beneficiary of a luxury apartment in the complex adjacent to Waterline Square- owned by the same developer, and managed by HPD/BG. No rental agreement was ever filed for this apartment, nor was it ever on the market, rather, the developer retained possession up until the point it was granted to Defendant Rosenthual.

52. Respectfully, this sickening pattern repeats itself over and over. When Defendants want any public official to align with the shameful criminal

conduct- whether it is a councilmember, court employee, or judge, they

simply dangle in front of them an attractive property interest, such as (a) an

affordable Property for which they are ineligible; alternatively, (b) properties

owned by the same developer that the developer never released to the open

market (c) other methods that will be shared before the Honorable Court.

This bribery is further proven by thousands of dubious transfer deeds from

Defendants HPD and BG.

## **LIMITED MANDATORY RELIEF IS HEAVILY WARRANTED IN LIGHT PROLONGED HOMELESSNESS DURING THE GLOBAL PANDEMIC, LIKELIHOOD OF SUCCESS AND THE BALANCE OF EQUITIES**

### **I.     THE STANDARD FOR LIMITED MANDATORY RELIEF**

53. Based on the established interpretation of Rule 65 of the Federal Rules of

Civil Procedure, to prevail on a request for a limited mandatory injunction,

the moving party must establish[25]: (1) a likelihood of success on the merits;

(2) irreparable harm in the absence of the injunction; (3) balancing of the

equities in his favor. Here, all of these factors heavily support granting

limited, emergency relief, such that Plaintiff can escape the unbearable

---

[25] *Weinberger v. Romero—Barcelo,* 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006).

harm, pain, and suffering of prolonged homeless during the pandemic, while

dozens of apartments for which he is eligible- remain vacant.

## II.    IRREPARABLE HARM: IMMINENT THREAT OF THE CORONAVIRUS

54. *First,* to date, more than 7.1 million people tested positive for coronavirus,

of which more than 400,000 people have tragically passed, and an unknown

number of others are in critical condition. Experts project that up to 80

percent of New York City residents will contract the disease.

55. For obvious reasons- to include unsanitary conditions and a weaker immune

due to the stress of being homeless for six months- Plaintiff's chances of

survival are exponentially lower in his current state of homelessness.

56. *Second,* at the onset of the global health crisis, all branches of NYS

government- executive, judicial, and legislative- took active measures that

are demonstrative of human compassion, rather than inhuman indifference.

These measures include a sensitivity to protect the homeless population

during the pandemic. In doing so, our government rejected the position that

it is appropriate to show indifference to the torture endured by a qualifed

affordable housing candidate, pursuant to prolonged homelesness, while an

abundance of immediate solutions are available.

57. ***Third,*** by executive order, evictions across New York State have halted. In doing so, the executive branch demonstrated, yet again, compassion for people who would otherwise be homeless during a pandemic.

### III.    BALANCE OF EQUITIES

58. ***First***, In light of the pandemic, Defendants announced that they are relaxing many of the restrictions on the affordable housing application process, in order to help people find stable housing arrangements during the pandemic: "We are pleased to introduce new changes to the Housing Connect lottery process, aimed at moving New Yorkers into stable, affordable housing as quickly as possible, during the COVID crisis and beyond"[26].

59. ***Second***, in a dramatic and pertinent development Defendants announced last Saturday there are 22 available units in Waterline Square, that will be subject to a second lottery and that the new income criteria has been lowered to $27,875-$31,840, under which Plaintiff would qualify even according to the Court's calculations (page 5 of the Court's Order dated August 16, 2019).

60. ***Third***, by the grace of God, Plaintiff has not contracted the coronavirus as of today. Regretfully, this can change at any minute. Plaintiff's grandfather, in his 90's, has tested positive for COVID-19, and is at Mt. Sinai in intensive

---

[26] https://www.kingscountypolitics.com/city-relaxes-roadblocks-for-affordable-housing-lottery/

care. Plaintiff's father has also tested positive for the virus. Plaintiff's

mother, as Defendants are well-aware, has been battling for the past ten (10)

years with a crippling auto-immune disease that impedes her speech and

mobility. Prior to applying to The Subject Property, Plaintiff was his

mother's full-time personal aid. Plaintiff's mother desperately needs his help

for physical therapy and attending critical doctor appointments. Waterline

Square is located within walking distance to his mother's apartment, and by

far- the Property closet in proximity. Defendants know these facts.

61. ***Fourth,*** during Appellant's harrowing 13-month ordeal, dozens of

apartments for which Appellant was eligible, stood vacant.

Newly-discovered evidence is demonstrative of the fact many of these

apartments were unlawfully transferred for free to HPD executives.

Respectfully, it is intolerable for any judicial conscience that Plaintiff should

die from unsanitary conditions in a shelter, while Defendants disgraceful

Scam continues to prosper.

### IV.   LIKELIHOOD OF SUCCESS

62. ***First,*** the right for adequate shelter is well-established[27] in New York State

and New York City. The New York State Constitution specifically obligates

---

[27] *Callahan v. Carey, No. 79-42582 (Sup. Ct. N.Y. County, Cot. 18, 1979);  Eldredge v. Kock, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983); McCain v. Koch, 511 N.E. 2D 62 (N.Y. 1987).*

the state to care for those in need: "the aid, care and support of the needy are

public concerns and shall be provided by the state and by such of its

subdivisions...[28]". This provision was the basis for the landmark First

Department *Callahan* case[29], in which New York City recognized the right

of every homeless man to receive adequate shelter and board (in *Eldredge*[30],

*Callahan* was expanded to apply to homeless women, and in *McCain*[31],

*Callahan* was expanded to include homeless families).

63. As a resident of New York City, Plaintiff has a right for adequate shelter.

Due to the current extenuating circumstances of an unprecedented global

epidemic, Plaintiff's right for adequate shelter is denied when forced into an

dangerous environment where there is a high probability of contracting the

coronavirus. Although the Court has consistently shown indifference - and

worse- to this reality, Plaintiff prays with the Honorable Court to recognize

the travesty that has transpired.

64. After applying for ten years to affordable housing, Plaintiff finally was

promised- after a long application process- that he had completed the

application process, and would be coming to sign a lease. Permanent

---

[28] Article XVII, Section 1 of the New York State Constitution.
[29] *Callahan v. Carey, No. 79-42582 (Sup. Ct. N.Y. County, Cot. 18, 1979).*
[30] *Eldredge v. Kock, 118 Misc. 2d 163 (N.Y. Sup. Ct. 1983).*
[31] *McCain v. Koch, 511 N.E. 2d 62 (N.Y. 1987).*

housing is in itself a valued public interest, as evident by the very concept of affordable housing.

65. By virtue of Defendants misconduct, it is just and appropriate for Defendants to remedy Plaintiff's peril by granting him the long term- or at least, temporary- housing opportunity to which, at the very least, he has made a compelling case for eligibility, providing his application is reviewed objectively, and without prejudice.

66. Rather than force Appellant to seek refuge in a shelter that is inadequate due to the risk of death, Defendants should, as a matter of law, equity, and common sense, utilize the express authority granted to them[32] to cure the harm caused by their outrageous conduct.

67. *Second*, Plaintiff's income has always been a match to the property. For a detailed illustration of the malicious ways Defendants "miscalculated" Plaintiff's income and disregard countless statutory obligations, please see Sup. Crt. 101960/2019, Dockets #4 (FOIL violations), #20 (income-calculation violations), Appl. Div. Docket #9, 04206- EXHIBITS A1-A10, and Docket #27, pages 194-232.

---

[32] The Court's settlement recommendation, the minimum income waiver for DHS referral pursuant to page 40 of the Handbook, the authorization granted pursuant to extenuating circumstances provisions on pages 41, 42, and 56, and the fairness requirement on page 05, *inter alia,* heavily support the grant of a limited injunction.

68. ***Third,*** in light of the overwhelming evidence of fraud on the court,

Defendentad elaborate Scam, orders that were procured by fraud should be

vacated.

## SPECIFIC ALLEGATIONS REGARDING THE APPLICATION PROCESS

### I.   July 2018: Plaintiff's Applies to the Property

69. The Subject Property is a residential complex in Manhattan with 1132

housing units, developed by the GID Real Estate Group ("Developer"). Of

these units, 269 units are designated by the relevant statutes as affordable

housing units for applicants whose annual income is between

$37,578-$43,860.

70. In ten years of applying to affordable housing, Plaintiff never received a

number low enough to advance him past the initial lottery stage.

71. Plaintiff filed a timely application in July 2018, for a one-bedroom or studio

apartment at the Property. Over 74,000 applicants applied to the Property.

72. For the first time in ten years of applications, Plaintiff received an

extremely favorable priority, placing him in the 0.9987% priority percentile.

For the first time in ten years of applications, this number effectively

guaranteed Plaintiff an apartment, permitting he passed the income calculation phaze[33].

73. On March 05, 2019, Plaintiff was called in for an initial (first-ever) interview at the BG offices. In this meeting, Plaintiff furnished all documents that were required of him (approximately 90 documents).

74. From March 05, 2019 to June 07, 2019, Plaintiff complied in a timely manner with eight additional requests for hundreds of additional sensitive financial documents.

75. Throughout this entire period, Plaintiff was subjected to the admittedly-unlawful conduct[34] of Defendant Fong, who violated lawful procedure and deprived Plaintiff of various rights, including the right for a fair application process by: (1) applying pressure on Plaintiff to withdraw his application; (2) threatening to reject Plaintiff for infractions such as redacting sensitive information, or sending files in the wrong format; (3) taking active measures to have Plaintiff rejected, for example, demanding

---

[33] Plaintiff's actual log number/number of applicants = 103/74,000 = 0.9987%.
Plaintiff's *raw log number* was #5695- the lowest (and as such- most favorable) number he ever received. Considering the Developer was mandated by law to give applicants from Community Board 7 a 50% preference (Plaintiff lived in Community Board 7), Plaintiff's *actual log number*- as confirmed by the specific property manager, Mr. Gabrial Mombrun- was #103. Per Mr. Mombrun's account, were Plaintiff to pass the income evaluation phaze, his low log number effectively guaranteed him an apartment.
[34] Plaintiff presented to Defendants counsels' hi-quality audio recordings, in which Fong's manager, Labarta, apologized for Fong's unlawful conduct.

new files hours before a critical deadline; (4) lying to Plaintiff in emails about the time of a critical deadline. There was no reason, no justification for Fong's outrageous conduct, which remains unexplained.

## II.    June 7, 2019: Plaintiff Is Notified of Qualification

76. On June 07, 2019, at 11:53am, after undergoing an excruciating, eight-month application process that featured countless violations of law, Fong notified Plaintiff his application was approved, and that he would be coming to sign a lease on the week of June 10, 2019.

## III.    June 10, 2019: Fong Issues 1st Rejection

77.  Upon politely protesting a disturbing attempt to sabotage his application by Fong (pursuant to being approved), Plaintiff was sent a cryptic 1st rejection letter, based on the unauthorized and unlawful-per-se cause of 'inconsistent information'.

78. The rejection letter sent to a good-faith after a grueling, eight-month application process, did not reveal what information was allegedly inconsistent.

79. Critically, the Handbook and the Regulatory Agreement- as the relevant authorities- specifically prohibited a rejection based on such a cause. Till

this day, nearly nine months later, neither Defendant, nor their respective

counsel, offer any justification for this unlawful 1st rejection.

### IV.    The 1st Rejection is Fatal Based on Defendants Own Admission

80. Worse yet, the bitter truth is that once that first rejection is issued, the

applicant is doomed. No matter how baseless, both Defendants will stop at

nothing to affirm the original determination, even if they have to *discover*

*novel justifications to reject the affordable housing applicant.*

81. We know this for three reasons: (a) HPD's spokesperson admitted this fact

with an investigative journalist[35] who authored a paper illustrating the

stomach-turning injustice inflicted on millions of affordable housing

applicants; (b) due to the dismal number of determination reversals; (c) alas,

it is also rational: rather than exposing an arbitrary and capricious

determination, Defendants are motivated to appear competent by *discovering*

*new post-facto justifications that gives credence to a baseless rejection.*

82. On first appeal, Defendant Labarta, senior manager at BG, apologized for

the rejection and the unlawful conduct of Fong. Labarta immediately

reversed the determination. Defendant Labarta then required Plaintiff to

---

[35] EXHIBITS A3-A4 of Docket # 9 on NYSCEF, Appl. Div 1st Dep. 04-206).

undergo a second evaluation of documents which had already been vetted and given three months prior, in violation of law[36].

83. In recorded conversations, Labarta promised that in an effort to remedy the torture Fong had unjustly inflicted, that *she would reach out to Plaintiff regarding any questions she would have- prior to issuing a second rejection.*

84. The ensuing events:

    V.    **June 10 2019: Pursuant to being approved, Defendant  Fong sends Plaintiff a blank, unlawful-per-se rejection based on unspecified inconsistent information.**

    VI.    **June 20, 2019: Defendant Labarta Issues 2nd Rejection on different grounds of insufficient income. Her calculations are based on a flurry of mathematical errors and four cryptic, conclusory numbers that Labarta refused and still refuses to explain[37].**

    VII.    **June 28, 2019: Defendant Rosen Lies about File Being Transferred.**

    VIII.    **June 11-July 03, 2019: Defendant Pell's Shows Indifference to her oversight obligations[38].**

---

[36] Page 5 of the Handbook specifically requires the application process to be fair. Forcing an applicant to undergo a second evaluation of documents that were already approved, is anything but fair.

[37] On the scale of egregious, arbitrary and capricious Labarta's 2nd rejection did little to improve. It contained three blatantly-erroneous numbers with no underlying computation showing how these numbers were reached, and a single conclusory number with a brief, erroneous calculation. Whereas the relevant statute of law required giving a specific and detailed explanation, Plaintiff was deprived of this right. Whereas Labarta expressly promised to reach out for clarifying information, no such call was made.

[38] On June 11, 2019, Plaintiff contacted Pell. Pell did absolutely nothing to enforce the blatant violations of the Handbook. HPD's FOIL response demonstrates that not a single internal HPD

IX. **July 03, 2019:  Defendant Cucurullo Issues 3rd Rejection, copy-pasting Defendant Labarta Issues 2nd Rejection, and adding a new cause of unlawful-per-se inconsistent information, different than the original.**

X. **July 9, 2019: Pell Issues 4th Rejection based on a different income calculation method that is specifically refuted by the Regulatory Agreement, and a series of astounding conclusory numbers that are refuted by hundreds of financial documents.**

XI. **In conclusion, from June 10-July 09, 2019, Plaintiff was Unlawfully Rejected Four Times On Shifting Grounds.**

## FIRST AND SECOND CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS
**(1) Discrimination based on Race in Violation of the Protective Statutes**
**(2) Violation of Fiduciary Duties Pursuant to the Protective Statutes**

85. Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

86. Granted the opportunity, Plaintiff will present this Honorable Court with clear and convincing evidence that he was rejected from Waterline Square for unlawful reasons that have nothing to do with the shameful rotating list of excuses conjured. The truth is that Defendants rejected Plaintiff because (a) he isn't a member of a particular ethnic group (b) to further Defendants sickening Scam.

---

communication showed any concern about a marketing agent rejecting applicants based on fictitious justifications.

87. As a direct and proximate result of Defendants Criminal Conduct, Plaintiff continues to endure extraordinary harm, monetary damages, prolonged homlessness, humiliation, severe emotional distress, mental and physical anguish and suffering, and damages to be determined at trial.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (3) Criminal Conduct in Violation of the RICO

88. Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

89. Granted the opportunity, Plaintiff will present this Honorable Court with clear and convincing evidence that (a) Defendants constitute an enterprise engaged, *inter alia,* in (b) pervasive embezzlement, bribery of public officials, wire fraud, obstruction of justice, alteration of official records, perjury, and racially-discriminatory housing practices; (c) that the alleged conduct is sufficiently pervasive to establish a pattern (d) involves state and federal property (e) continues even as these words are written.

90. As a direct and proximate result of Defendants Criminal Conduct, Plaintiff continues to endure extraordinary harm, monetary damages, prolonged homlessness, humiliation, severe emotional distress, mental and physical anguish and suffering, and damages to be determined at trial.

91. Further, the threat to the public's welfare strongly supports treble damages pursuant to the RICO. Throughout the hell Plaintiff endured, he has met dozens of other wrongfully-rejected, low-income, affordable-house applicants. In addition to those, hundreds of detailed horror stories from other aggrieved applicants are available on-online. These applicants - some of whom are verified by the official apology posted by the oversight agency-detail a sickening corruption in an application process that is mandated by law to be fair and transparent.

## **CONCLUSION**

92. The foregoing was written with humility, respect, and the deepest conviction that Defendants conduct not only inflicted inexpressible harm and an unconscionable injustice, it also implores warranted and equitable judicial intervention. Respectfully, the City of New York deserves more than powerful, above-the-law public officials who abide by the credo "as long as you don't get caught, embezzle all you can", and who utilize bribery as an effective tool to oversight agencies from interfering with their criminal enterprise. Respectfully, the catastrophic effects of public corruption motivated by a racially-discriminatory bias and insatiable greed, go well-beyond Plaintiff's personal nightmare, and call for a serious, corrective

response. Such a response would be in sharp contrast to the response Plaintiffs encountered thus far from other agencies, somewhere on the spectrum between deliberate indifference, laissez faire, or in some cases-active attempts to shield the culprits from accountability.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

I.    Limited relief to escape the deadly threat of the coronavirus, based on the merits and the compelling evidence of an inexpressible misscarriage of justice.

II.   Award of damages, according to proof, including treble and liquidated damages, to be paid by Defendants, in an amount to be determined at trial.

III.  In light of the discovery of irreftuablce evidence that this dispute involves federal question of blatant discrimination based on race, and in light of clear of convincing evidence Defendants corrupted the judicial process, and in light of the most recent development (June 6, 2020), where Part 56 abruptly ordered this proceeding to be transferred to another judicial part, may the Honrobale Court use its

authority to transfer the related state proceeding case number Sup Crt. 101960/2019 to federal court.

IV.   As an equitable remedy for the sickening ways Plaintiff's basic rights for due process of law were set aside in State proceedings, time and time again[39], may the Honorable Court consider hiring a pro bono attorney in some capacity.

V.   Due to the sickening breach of administrative integrity of top NYC public officials and the corruption of the judicial process, may the Honorable Court consider ordering an investigation from an uncompromised federal investigative agency that has no ties or affiliation to the practice of transferring Properties for free.

VI.   Any further legal and equitable relief that the Honorable Court deems appropriate and just.

I, hereby affirm under the penalty of perjury that the forgoing is true and accurate to the best of my knowledge and belief.

Respectfully submitted,

**Abraham Gross**

---

[39] Appl. Div. NYSCEF, 04-206, #27, and pages 1- EXHIBIT H11.

# EXHIBITS A_0

# Volunteers of America

Greater New York

65 Charles Gay Loop, Wards Island, NY 10035

Phone: 212-369-8900

**Date: 9/27/19**

This is to introduce **Abraham Gross** who is currently a Resident at the Schwartz Assessment Men's Shelter; He has been a resident at Schwartz since, **9/24/19**. The Shelter is located at 65 Charles Gay Loop, Ward's Island, New York, N.Y. 10035.

IDENTIFYING DATA:

**CARES: 2151221**

**BED #    1- 289**

**D.O.B:    12/19/81**

**S.S. #:    XXX-XX-5166**

As Resident in the shelter, client receives Lodging services, Toiletries, Three meals a day and Case Management services. Please let this resident's letter serve as a referral letter to Housing Preservation Development (HPD). Thank you for your cooperation and assistance with regards to this client; if there is any other information that is required or need please feel free to contact me.

Respectfully yours,

CM Rodolfo Rivera

65 Charles Gay Loop, Wards Island, NY 10035 (Office 24)

Phone: 212-369-8900, Ext #6532



Breaking Ground/Waterline Square
330 West 42nd Street, 14th Floor
New York, NY 10036

6/10/2019

Abraham Gross
40 West 77st
10C
New York, NY 10024

Re:     Waterline Square
675 West 59th Street | 400 West 61st Street | 645 West 59th Street
New York, NY, 10023
Log #:___5695___

Dear Applicant:
We received your application for residency in the project indicated above. Based on the
guidelines for eligibility for this project, your application has been rejected for the following
reason(s):

_____   **1. Upon        complete review, your income and/or household size does not meet
the**

**guidelines.**  *See attached income eligibility chart.*

Your household income: _____

Your household size:  _____

_____   **2.     Your income does not demonstrate a continuing need.**

☐ Assets
☐ Property Ownership
☐ Gift Income
☐ Other:

_____   **3.     Criminal background check:**

__X__ **4.     Your application and/or documentation has been found to include
inconsistent**

**information.**

_____   **5.     Failure to schedule an eligibility appointment or failure to attend a
scheduled and**

**confirmed appointment.**

ENGLISH REJECTION NOTICE



Breaking Ground/Waterline Square
1359 Broadway, 9th Floor
New York, NY 10018

Date: 6/20/2019

Abraham Gross
40 West 77th Street
Apt 10C
New York, NY 10024

Re:     Waterline Square
675 West 59th Street | 400 West 61st Street | 645 West 59th Street
New York, NY, 10023
Log #:    5695

Dear Applicant:

We received your application for residency in the project indicated above. Based on the guidelines for eligibility for this project, your application has been rejected for the following reason(s):

**__X__     1. Upon complete review, your income and/or household size does not meet the Guidelines.** *See attached income eligibility chart.*

Your household income:    $16,379.58

Your household size:    1

Extreme Reach- $498.65/6= $83.1083333333*12= $997.30

Net from self-employment- $2,627.66

Unemployment Benefit- $12,754.62

**__     2.     Your income does not demonstrate a continuing need.**

Assets

☐     Property Ownership

☐     Gift Income

☐     Other:

**___     3.     Criminal background check:**

**____     4.     Your application and/or documentation has been found to include inconsistent Information.**

ENGLISH REJECTION NOTICE

 



Breaking Ground/Waterline Square
330 West 42nd Street, 14th Floor
New York, NY 10036

Date: __7/3/19__

Abraham Gross
40 West 77th Street
Apt 10C
New York, NY 10024

Re:     Waterline Square
675 West 59th Street | 400 West 61st Street | 645 West 59th Street
New York, NY, 10023
Log #:____5695____

Dear Applicant:
We received your appeal of the rejection of your application for residency in the project indicated above. We have conducted an additional review of your application with the new information you provided. Unfortunately, based on the guidelines for eligibility for this project, your application has been rejected for the following reason(s):

__X__   **1.   Your income and/or household size does not meet the guidelines.**
*See attached income eligibility chart.*

Your household income: ____$16,379.58____

Your household size: ___1___

**Extreme Reach**: $498.65/6 = $83.10833 X 12 = $997.30
**Net from Self-employment**: $2,627.66
**Unemployment**: $12,754.62
**Gift Income**: $0 (proof of receipt of income for at least 6 months was not provided)

____   **2.   Your income does not demonstrate a continuing need.**

☐     Assets

☐     Property Ownership

☐     Gift Income

☐     Other: _____

____   **3.   Criminal background check:**

_____

ENGLISH APPEAL REJECTION NOTICE



**Department of
Housing Preservation
& Development**
nyc.gov/hpd

**Office of Asset & Property
Management
Division of Housing Opportunity &
Program Services**
100 Gold Street
New York, N.Y. 10038

**LOUISE CARROLL
Commissioner**

**EVA TRIMBLE
Executive Deputy Commissioner**

**A. A. HENDRICKSON
Deputy Commissioner**

**MARGARET BROWN
Associate Commissioner**

July 9, 2019

Abraham Gross
40 West 77th Street
Apt 10C
New York, NY 10024

Re: Waterline Square. Log #5695

Dear Abraham Gross:

This letter is in response to the correspondence you filed with the City of New York Department of Housing Preservation and Development (HPD) regarding your application to: Waterline Square, which is a privately-owned development located in Manhattan. The lottery and lease up process for the affordable units are monitored by HPD.

Please be advised that tenant selection is the responsibility of the building owners and managing agents. As the supervising agency, HPD reviews requests by applicants to determine if there are any grounds to question or intervene in their decision using the information that was available to either the building owner or managing agent at the time of an applicant's submission.

HPD requested your file from management and reviewed it in its entirety. The primary reason for your rejection was that your household did not meet the minimum income required.

An applicant may have a combination of wages and self-employment income. Such applicants may also have sporadic unemployment income. Their income should be evaluated similarly to the instructions outlined in the self-employment section; however, the evaluation will include both W2 wages and self-employment income.

For applicants with "combination income," the most recent two years of tax returns should be reviewed and evaluated (page 52).

Households receiving gift income exceeding $10,000/year are not eligible unless they would be income-eligible with or without the gift income (page 58).

Based on your file, your 2017 Historical Income is Wages $9,565+ your 2018 Historical Income is Wages $18,685+ Self-Employment $0 + Unemployment Insurance $2,600= $30,850 /2= $15,425

Your gift income is $1,000 x 12= $12,000 and it exceeds the maximum gift income allowed.

The minimum income for a single household at 60%AMI is $37,578

Based on the above information, HPD finds no grounds to interfere in the decision regarding your application for this project.

Please review our Marketing Handbook: http://www1.nyc.gov/assets/hpd/downloads/pdf/developers/marketing-handbook.pdf

In the case that an applicant's income changes after the eligibility appointment (for reasons other than change in household composition and such change impacts their eligibility for the unit for which they are in process, the Marketing Agent will not reconsider the application unless the change is due to an extenuating circumstance (page 42).

All of the applicants to this and similar developments are held to the same standards and subject to the same income calculation criteria.

Thank you for your continued interest in our programs, and we wish you the best success in your apartment search.

Sincerely,



Compliance Reviewer
Marketing and Affordability Oversight Program

Printed on paper containing 30% post-consumer material.

**From:** Pell, Shatara (HPD) <PellS@hpd.nyc.gov>
**Sent:** Monday, July 8, 2019 11:05:20 AM
**To:** Teresa Palmieri; Dormi, Nidia (HPD); Vanessa Cucurullo; Stephanie Labarta; Sasha Williams; Jon Lee
**Cc:** Mombrun, Gabriel (HPD); Morgan, Monica (HPD); Hernandez, Victor (HPD); Lugo, Edwin (HPD)
**Subject:** RE: ███████████ waterline Square | Log █████

Hi Teresa,

This file is out of order with skewed documents. The way this file was sent is completely tossed around and unprofessional and it needs to be resent in a decent order. I'm really confused, does Breaking Ground review the files they send to us?

Thank You,

**Shatara Pell | Deputy Director | Marketing and Affordability Oversight Program**
NYC Department of Housing Preservation & Development
212-863-6211

**From:** Dormi, Nidia (HPD) <DormiN@hpd.nyc.gov>
**Sent:** Friday, July 5, 2019 3:07:42 PM
**To:** Vanessa Cucurullo; Stephanie Labarta; Sasha Williams; Jon Lee; Teresa Palmieri
**Cc:** Pell, Shatara (HPD); Mombrun, Gabriel (HPD); Morgan, Monica (HPD); Hernandez, Victor (HPD); Lugo, Edwin (HPD)
**Subject:** RE ███████ | waterline Square | Log ██████

Good afternoon,

Can we go over this file Monday morning? Mr. Lugo and I have been trying to figure this file but we would need further clarification. In addition to that, the applicant has submitted an ineligible letter dated June 10, 2019 that has not been included in his file.

We will be available for a call at 11 am, please confirm.

Thank you,

Nidia Dormi | **Senior Policy Analyst** | Marketing and Affordability Oversight Program
NYC Department of Housing Preservation & Development
212-863-5565

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
-------------------------------------------------------------------- x

ABRAHAM GROSS,

                            Petitioner-Appellant,

                 -against-

THE DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT (HPD),

-and-

BREAKING GROUND (BG),

-and-

RCB1 RESIDENTIAL FOR SALE LLC,
RCB3 RESIDENTIAL FOR SALE LLC,
RCB4 RESIDENTIAL FOR SALE LLC,

                   Respondents-Respondents.

-------------------------------------------------------------------- x

> **AFFIRMATION IN OPPOSITION TO PETITIONER'S MOTION FOR A MANDATORY PRELIMINARY INJUNCTION**
>
> Index No. 101081/2019

    **SAMANTHA SCHONFELD**, an attorney at law admitted to practice in the Courts of this State, hereby affirms the following as true under penalties of perjury:

    1.    I am an Assistant Corporation Counsel in the office of James E. Johnson, Corporation Counsel of the City of New York, the attorney of record for Respondent, the New York City Department of Housing Preservation and Development ("HPD") in the above-captioned proceeding. I am fully familiar with the facts and circumstances of this proceeding based upon my review of the records of HPD and conversations with employees of HPD.

    2.    I submit this affirmation in opposition to the motion of Petitioner-Appellant, presumably made under CPLR § 5518 and returnable on January 27, 2020, for a

### The Regulatory Agreements for the Subject Development

8.      On November 15, 2016, the City of New York, HPD, and RCB1 Nominee LLC and RCB1 Affordable LLC, RCB3 Nominee LLC and RCB3 Affordable LLC, and RCB4 Nominee LLC and RCB4 Affordable LLC (collectively "RCB"), the owner of the subject development, entered into the Regulatory Agreements regarding the subject development. Copies of the three Regulatory Agreements are annexed collectively hereto as Exhibit "A."

9.      Pursuant to the Regulatory Agreements, RCB contracted with Common Ground Management Corp. ("Breaking Ground")[2] to act as Administering Agent for the Subject Development. See Exhibit "A" at ¶ 11. As the Administering Agent, Breaking Ground agreed to ensure that the Subject Development's units would be rented "in compliance with [the Affordable Housing Plan and all of the requirements of [Section 23-911 of the New York City Zoning Resolution and the Inclusionary Housing Program Guidelines] . . . ." See id. at ¶ 11. Further, the Administering Agent "shall be required to market the Affordable Housing Units in accordance with the Program." Id. at ¶ 21.

10.     With respect to the initial occupancy of the affordable housing units of the subject development, Breaking Ground, the Administering Agent, must provide to HPD an initial occupancy certification. Id. at ¶ 22. The Regulatory Agreement states, in pertinent part, as follows:

> Initial Occupancy Certification. Within sixty (60) days following the DCHR Registration Deadline,

---

[2] Common Ground Management Corp. is now known as Breaking Ground—the other named Respondent in the instant proceeding. As this entity's current name is "Breaking Ground," Respondent HPD will hereinafter refer to this entity as "Breaking Ground."

the Administering Agent shall submit to the Department an affidavit attesting that each Household occupying an Affordable Housing Unit complied, at Initial Occupancy, with the annual income eligibility requirements of the Program and that the Monthly Rent registered and charged for each Affordable Housing Unit, complied with the Monthly Rent requirements for such unit, at Initial Occupancy . . . "Annual Income" shall mean the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the initial determination of income. The Administering Agent shall also retain all records and documents relating to income determination for a minimum of three (3) years after the date a tenant commences occupancy in an Affordable Housing Unit.

Id. (emphasis added).

11.     In the Administering Agent Agreement Inclusionary Housing Program between HPD and Breaking Ground, which is annexed as an exhibit to the Regulatory Agreement, Breaking Ground "assume[d] the ongoing responsibility for insuring that each Affordance Housing Unit is rented and upon vacancy re-rented in compliance with the Regulatory Agreement." Id. at Ex. F.

## Marketing Handbook and Income Guidelines for Subsidized Residential Developments

12.     The New York City Housing Development Corporation ("HDC") and HPD published a Marketing Handbook: Policies and Procedures for Resident Selection and Occupancy (the "Marketing Handbook") for residential developments subsidized by HPD and HDC. A copy of the Marketing Handbook, revised July 2018, is annexed hereto as Exhibit "B."

- 6 -

the Administering Agent shall submit to the Department an affidavit attesting that each Household occupying an Affordable Housing Unit complied, at Initial Occupancy, with the annual income eligibility requirements of the Program and that the Monthly Rent registered and charged for each Affordable Housing Unit, complied with the Monthly Rent requirements for such unit, at Initial Occupancy . . . "Annual Income" shall mean the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the initial determination of income. The Administering Agent shall also retain all records and documents relating to income determination for a minimum of three (3) years after the date a tenant commences occupancy in an Affordable Housing Unit.

ed).

FILED: APPELLATE DIVISION - 1ST DEPT 04/02/2020 09:08 PM

NYSCEF DOC. NO. 21

2019-04206

RECEIVED NYSCEF: 04/02/2020

Breaking Ground/Waterline Square
330 West 42nd Street, 14th Floor
New York, NY 10036

6/10/2019

Abraham Gross
40 West 77st
10C
New York, NY 10024

Re:   Waterline Square
675 West 59th Street | 400 West 61st Street | 645 West 59th Street
New York, NY, 10023
Log #:___5695___

Dear Applicant:
We received your application for residency in the project indicated above. Based on the guidelines for eligibility for this project, your application has been rejected for the following reason(s):

____   1. Upon         complete review, your income and/or household size does not meet the

guidelines.   *See attached income eligibility chart.*

Your household income: _____

Your household size:   _____

____   2.      Your income does not demonstrate a continuing need.
☐ Assets
☐ Property Ownership
☐ Gift Income
☐ Other:

____   3.      Criminal background check:

__X__ 4.      Your application and/or documentation has been found to include inconsistent

information.

____   5.      Failure to schedule an eligibility appointment or failure to attend a scheduled and
confirmed appointment.

ENGLISH REJECTION NOTICE

🔒 https://www.kingscountypolitics.com/city-relaxes-roadblocks-for-affordable-housing-lottery/

☰ **Kings County Politics**   NEWS ▾   GET INVOLVED ▾   COMMUNITY   PODCAST   ABOUT ▾   ** SUBSCRIBE **



MORE MONEY FOR SCHOOLS? FILL OUT THE CENSUS.   NYC | CENSUS 2020   My2020census.gov

**HOUSING**

# *City Relaxes Roadblocks For Affordable Housing Lottery*



By Chaya Gurkov

Posted on April 22, 2020

SECTIONS    SEARCH

# DAILY●NEWS

SUBSCRIBE
SALE: $1 FOR 3 MONTHS

**LATEST CORONAVIRUS UPDATES IN NYC AND AROUND THE WORLD**

'She is crying like a little b----': Cruel couple tossed 6-year-old's belongings out ... 

Howard Stern mocks the 'wisdom' of Donald Trump Jr.: 'You can't argue with a geni... 

'How does this happen?' asks Queens woman after finding abandoned girl, 6, at busy... 

'Needs our prayers': Security camera captured man's near-fatal beating of ex-girlfriend... 


From the TUNNEL TO TOWERS FOUNDATION and America's Artist SCOTT LOBAIDO

**CORONAVIRUS**

# New York City sees at least 76 homeless people die of coronavirus



By **ANNA SANDERS**
NEW YORK DAILY NEWS   |   MAY 18, 2020   |   5:49 PM

  



**NYC Housing Connect**

# Affordable Housing for Rent

### Waterline Square Phase II
### 22 NEWLY CONSTRUCTED UNITS AT 645 West 59th Street, New York, NY 10069
### Upper West Side

**Amenities:** 24-hour attended lobby, in-unit washer/dryer, resident lounges, WaterLine Club (includes an extensive list of amenities including a bowling alley, pool, fitness center, basketball court, music studio and art studio)* (*additional fees apply)

**Transit:** Trains: A, B, C, D, 1; Buses: M57

**No fee to apply • No broker's fee • Smoke-free building**

This building is being constructed through the Low-Income Housing Tax Credit (LIHTC) Program of New York State Homes and Community Renewal and the Inclusionary Housing Program of the New York City Department of Housing Preservation and Development (HPD), and is anticipated to receive a Tax Exemption through HPD's 421-a Tax Incentive Program.

**Who Should Apply?**

Individuals or households who meet the income and household size requirements listed in the table below may apply. Qualified applicants will be required to meet additional selection criteria. Applicants who live in New York City receive a general preference for apartments.

- A percentage of units is set aside for:
  - Mobility–disabled applicants (5%)
  - Vision/Hearing–disabled applicants (2%)
- Preference for a percentage of units goes to:
  - Residents of **Manhattan Community Board 7** (50%)
  - Municipal employees (5%)

## AVAILABLE UNITS AND INCOME REQUIREMENTS

| Unit Size | AREA MEDIAN INCOME (AMI) UNITS | Monthly Rent[1] | Units Available | | Household Size[2] | Annual Household Income[3] *Minimum – Maximum[4]* |
|---|---|---|---|---|---|---|
| 1 bedroom | 40% | $741 | 10 | → | 1 person | $27,875 - $31,840 |
| | | | | | 2 people | $27,875 - $36,400 |
| | | | | | 3 people | $27,875 - $40,960 |
| 2 bedroom | | $901 | 12 | → | 2 people | $34,080 - $36,400 |
| | | | | | 3 people | $34,080 - $40,960 |
| | | | | | 4 people | $34,080 - $45,480 |
| | | | | | 5 people | $34,080 - $49,120 |

[1] Rent includes heat, hot water and gas for cooking. Tenant is responsible for Electric.
[2] Household size includes everyone who will live with you, including parents and children. Subject to occupancy criteria.
[3] Household earnings includes salary, hourly wages, tips, Social Security, child support, and other income. Income guidelines subject to change.
[4] Minimum income listed may not apply to applicants with Section 8 or other qualifying rental subsidies. Asset limits also apply.

### How Do You Apply?
Apply online or through mail. To apply online, please go to nyc.gov/housingconnect. To request an application **by mail, send a self-addressed envelope to: Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. Only send one application per development. Do not submit duplicate applications. Do not apply online and also send in a paper application. Applicants who submit more than one application may be disqualified.

### When is the Deadline?
Applications must be postmarked or submitted online no later than **July 23, 2020**. Late applications will not be considered.

### What Happens After You Submit an Application?
After the deadline, applications are selected for review through a lottery process. If yours is selected and you appear to qualify, you will be invited to an appointment of eligibility to continue the process of determining your eligibility. Appointments are usually scheduled from 2 to 10 months after the application deadline. You will be asked to bring documents that verify your household size, identity of members of your household, and your household income.

**Español**    Presente una solicitud en línea en nyc.gov/housingconnect. Para recibir una traducción de español de este anuncio y la solicitud impresa, envíe un sobre con la dirección a: **Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. En el reverso del sobre, escriba en inglés la palabra "SPANISH." Las solicitudes se deben enviar en línea o con sello postal antes de 23 de julio 2020.

**简体中文**    访问 nyc.gov/housingconnect 在线申请。如要获取本广告及书面申请表的简体中文版，请将您的回邮信封寄送至：**Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. 信封背面请用英语注明"CHINESE"。必须在以下日期之前在线提交申请或邮寄书面申请2020年7月23日。

**Русский**    Чтобы подать заявление через интернет, зайдите на сайт: nyc.gov/housingconnect. Для получения данного объявления и заявления на русском языке отправьте конверт с обратным адресом по адресу **Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. На задней стороне конверта напишите слово "RUSSIAN" на английском языке. Заявки должны быть поданы онлайн или отправлены по почте (согласно дате на почтовом штемпеле) не позднее 23 июля 2020.

**한국어**    nyc.gov/housingconnect 에서 온라인으로 신청하십시오. 이 광고문과 신청서에 대한 한국어 번역본을 받아보시려면 반송용 봉투를**Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**으로 보내주십시오. 봉투 뒷면에 "KOREAN" 이라고 영어로 적어주십시오. 2020년7월23일까지 온라인 신청서를 제출하거나 소인이 찍힌 신청서를 보내야 합니다.

**Kreyòl Ayisyen**    Aplike sou entènèt sou sitwèb nyc.gov/housingconnect. Pou resevwa yon tradiksyon anons sa a nan lang Kreyòl Ayisyen ak aplikasyon an sou papye, voye anvlòp ki gen adrès pou retounen li nan: **Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. Nan dèyè anvlòp la, ekri mo "HATIAN CREOLE" an Anglè. Ou dwe remèt aplikasyon yo sou entènèt oswa ou dwe tenbre yo anvan dat 23 jiyè 2020.

**العربية**    إرسال طلب عبر الإنترنت على nyc.gov/housingconnect. لتلقي ترجمة باللغة العربية لهذا الإعلان والتطبيق المطبوع ، أرسل مظروفًا بالعنوان إلى: **Waterline Square Phase II c/o Breaking Ground, PO Box 760, New York, NY, 10018**. على ظهر المظروف، اكتب باللغة الإنجليزية كلمة "ARABIC". يجب تقديم الطلبات عبر الإنترنت أو عن طريق ختم بريدي قبل 23 يوليو 2020.

Governor Andrew Cuomo • Mayor Bill de Blasio • HPD Commissioner Louise Carroll • HCR Commissioner/CEO RuthAnne Visnauskas

     

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x

RICARTE ECHEVARRIA,

                                              Plaintiff,

                    -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION
AND    DEVELOPMENT;   and   ANNE-MARIE
HENDRICKSON, in her official and individual
capacity,

                                              Defendants.

-------------------------------------------------------------------------- x

**STIPULATION
OF DISMISSAL
WITH PREJUDICE**

17 Civ. 6073 (AT)

 

**IT IS HEREBY STIPULATED AND AGREED** by and between the parties as

represented by their attorneys below, that, pursuant to Rule 41(a)(1)(ii) of the Federal Rules of

Civil Procedure, the above-captioned action be, and it hereby is, withdrawn, discontinued, and

dismissed, with prejudice and without costs, expenses or fees of any kind to any party.

Dated:  Park Ridge, New Jersey
        February 15 , 2018

**KRAKOWER DICHIARA LLC**
Attorneys for Plaintiff
77 Market Street, Suite 2
Park Ridge, New Jersey 07656
(201) 746-0303
tk@kdlawllc.com

Dated:  New York, New York
        February 15 , 2018

**ZACHARY W. CARTER**
Corporation Counsel of the
  City of New York
Attorney for Defendants
100 Church Street, Room 2-112
New York, New York 10007-2601
(212) 356-4078
mconnaha@law.nyc.gov

By: _____
          Todd Krakower

By: _____
         Matthew J. Connahan
         Assistant Corporation Counsel

Todd Krakower, Esq.
Krakower DiChiara LLC
77 Market Street, Suite 2
Park Ridge, NJ 07656
Telephone: 201-746-0303
Fax: 347-765-1600

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
RICARTE ECHEVARRIA,

               Plaintiff,

    -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF HOUSING
PRESERVATION AND DEVELOPMENT; and
ANNE-MARIE HENDRICKSON, in her official
and individual capacity,

               Defendants.
-------------------------------------------------------x

**COMPLAINT**

**CIVIL ACTION NO.**

**DEMAND FOR JURY TRIAL**

    Plaintiff, by his attorneys, KRAKOWER DICHIARA LLC, complaining of the Defendants,
respectfully alleges, upon information and belief, as follows:

**INTRODUCTION**

    1.    Plaintiff brings this action seeking monetary and equitable relief based upon
Defendants' violations of 42 U.S.C. Section 1983 and New York Civil Service Law Section 75-b
(hereinafter "CLS § 75-b") as a result of maltreatment and retaliatory actions taken against him.

    2.    Plaintiff seeks economic and compensatory damages and punitive damages to the
extent allowable by law, and other appropriate legal and equitable relief pursuant to federal and
state law.

Case 1:20-cv-04515-CM   Document 1   Filed 06/11/20   Page 64 of 84

**JURISDICTION AND VENUE**

3.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) as this matter involves a federal question.

4.      This Court has supplemental jurisdiction over the New York state law claims under 28 U.S.C. § 1367(a), as they are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

**THE PARTIES**

**Defendants.**

7.      The Department of Housing Preservation and Development ("HPD") is, and at all times material hereto was, a public employer as that term is defined by N.Y. CLS Civ. S. §75-b and is an agency of Defendant City of New York.

8.      At all times relevant to this Complaint, Defendant HPD employed Plaintiff.

9.      At all times relevant herein, Defendant Anne-Marie Hendrickson was the Deputy Commissioner of the Office of Asset and Property Management within HPD.

10.     At all times relevant to this Complaint, Defendant City of New York employed Plaintiff.

**Plaintiff**

11.     Plaintiff Ricarte Echevarria ("Plaintiff") is a resident of Kings County in the State of New York.

12.     Plaintiff was employed by Defendants as Director of the Tenant Interim Lease Program at HPD from August 24, 2015 until September 9, 2016 when he was wrongfully terminated.

**FACTS**

13.     While employed at the City's HPD, Plaintiff was responsible for the day-to-day operations of the Tenant Interim Lease Program (TIL).

14.     The TIL Program assists organized tenant associations in City-owned buildings to develop economically self-sufficient low-income cooperatives where tenants purchase their apartments for $250.

15.     Tenant associations enter into a lease with the City to maintain and manage the buildings in which they live.

16.     Each tenant association participating in the TIL Program has a Net Lease with HPD that conveys property management and building operations to the Tenants' Association, including tenant selection.

17.     Each Tenants' Association operates under by-laws that specifically govern tenant selection procedures and protocols.

18.     Per the relevant rules and procedures, HPD's only involvement in tenant selection is approving each tenant selected by the Tenant Associations.

19.     Shortly after Plaintiff began working for HPD, Plaintiff began raising concerns about various unlawful activities to his supervisors and to the New York City Department of Investigation ("DOI").

20.     Shortly after Plaintiff began working for Defendant HPD, Plaintiff began raising issues to his supervisors and to the DOI, which Plaintiff reasonably believed to constitute improper governmental action.

21.     Specifically, in January 2016, Defendant Hendrickson—Deputy Commissioner of the Office of Asset and Property Management and Plaintiff's supervisor—sent Plaintiff an email directing him to grant an apartment in one of the buildings he managed for Mr. Brown.

22.     At all times relevant to this Complaint, Mr. Brown was an individual who was a resident of another state and a relative of an employee in the NYC Law Department.

23.     As Mr. Brown was a resident of another state, providing Mr. Brown with one of the low-income apartments violated relevant laws and regulations.

24.     Upon information and belief, Mr. Brown was not selected or approved by any Tenant Association.

25.     Plaintiff met with Vivian Louie—Assistant Commissioner of the HPD—in her office, and complained that giving Mr. Brown an apartment was unlawful because Mr. Brown did not meet any criteria or administrative purpose for receiving such an apartment.

26.     Ms. Louie responded that she "hated when [Defendant Hendrickson] does stuff like this."

27.     Ms. Louie further conceded that Mr. Brown did not meet any of the required criteria to be granted an apartment within the TIL Program.

28.     Nevertheless, over Plaintiff's objections, Defendant Hendrickson and Ms. Louie proceeded to provide an apartment for Mr. Brown.

29.     Plaintiff reasonably believed Defendant Hendrickson's and Ms. Louie's actions to constitute improper governmental action.

30.     In May 2016, Plaintiff reported Defendant Hendrickson's and Ms. Louie's unlawful actions to the New York City Department of Investigation (DOI).

31.     Plaintiff met with Deputy Inspector General David Jordan in Plaintiff's office and complained of Defendant Hendrickson's and Ms. Louie's unlawful actions.

32.     Plaintiff informed Mr. Jordan that he would provide the DOI with documents regarding his complaint once Plaintiff received an apartment inspection report for the apartment selected by Mr. Brown.

33.     Accordingly, on August 12, 2016, Plaintiff sent an email to Mr. Jordan and Ondie Frederick, an employee of the DOI, with documents related to Mr. Brown's unlawful apartment selection, as well as a copy of the email from Defendant Hendrickson instructing Plaintiff to grant Mr. Brown an apartment.

34.     On August 18, 2016, Plaintiff met with Mr. Jordan and Ms. Frederick to discuss Plaintiff's concerns regarding the legality and propriety of providing Mr. Brown with an apartment through the TIL Program.

35.     During the August 18, 2016 meeting, Plaintiff, Mr. Jordan, and Ms. Frederick discussed whistle-blower protection for Plaintiff.

36.     During the August 18, 2016 meeting, Mr. Jordan exclaimed that the selection of apartment for Mr. Brown through the TIL program "wreaks of impropriety!"

37.     Shortly thereafter, on August 29, 2016, Deputy Director Joan Smith walks into Plaintiff's office and informs Plaintiff that the DOI requested a copy of the apartment scope for the apartment linked to Mr. Brown.

38.     Plaintiff instructed Ms. Smith to provide the DOI with any documents they requested.

39.     Later in the day on August 29, 2016, Ms. Louie sends an email to Plaintiff directing Plaintiff to provide Ms. Louie with full access to Plaintiff's calendar.

40.     At no point in Plaintiff's employment as Director prior to his complaints to the DOI had Ms. Louie requested full access to Plaintiff's calendar.

41.     Plaintiff called the DOI and spoke with Ms. Frederick about Ms. Louie's calendar request.

42.     Ms. Frederick consulted with Jessica Heegan, Inspector General for HPD, and then Ms. Frederick instructed Plaintiff to delete all calendar events reflecting his meetings with the DOI and then to provide Ms. Louie with access to Plaintiff's calendar.

43.     The DOI began scheduling interviews and investigating Plaintiff's complaints in mid-August 2016.

44.     Immediately thereafter, on September 9, 2016, Defendant Hendrickson summarily and unlawfully terminated Plaintiff in retaliation for his complaints.

45.     Plaintiff was terminated in retaliation for his complaints to governmental bodies.

46.     Plaintiff was terminated in retaliation for his complaints to the DOI.

47.     Plaintiff was terminated in violation of NY Civil Service Law § 75-b.

48.     Defendants committed the above alleged acts knowingly, intentionally and willfully.


### FIRST CLAIM FOR RELIEF
### RETALIATION AGAINST PLAINTIFF FOR EXERCISING FREEDOM OF SPEECH IN VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS AND §1983

49.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

50.     Plaintiff's complaints to Defendants' regarding Defendants' unlawful actions were made as a private citizen.

51.     By complaining of the government's unlawful usage of governmental housing and public funds, Plaintiff complained of a matter of public concern.

52.     While acting under color of State Law, Defendants violated Plaintiff's First Amendment rights by retaliating against him for exercising his freedom of speech as a citizen with regard to matters of public concern by being an informant and/or reporting of unethical practices regarding improper governmental actions.

53.     As a proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff has suffered and continues to suffer a loss of past and future income, monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation, in an amount to be determined at trial.


### SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of N.Y. CLS Civ. S. §75-b)

54.     Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

55. Section 75-b of the New York Civil Service Law provides: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

56. Plaintiff reasonably believed Ms. Hendrickson and Ms. Louie engaged in improper governmental actions.

57. Plaintiff complained to his supervisors about actions Plaintiff reasonably believed to constitute improper governmental action.

58. By complaining to his supervisors about actions Plaintiff reasonably believed to constitute improper governmental action, Plaintiff engaged in protected activity pursuant to N.Y. CLS Civ. S. §75-b.

59. Plaintiff provided his supervisors reasonable time to take appropriate action in response to his complaints of improper governmental action.

60. Plaintiff's supervisors failed to take any actions to remedy the issues complained of by Plaintiff.

61. Plaintiff also complained to the DOI about actions Plaintiff reasonably believed to constitute improper governmental action.

62.     By complaining to the DOI about actions Plaintiff reasonably believed to constitute improper governmental action, Plaintiff engaged in protected activity pursuant to N.Y. CLS Civ. S. §75-b.

63.     In response to Plaintiff's complaints of improper governmental action, Defendants subjected Plaintiff to unlawful personnel action.

64.     In response to Plaintiff's complaints of improper governmental action, Defendants unlawfully terminated Plaintiff.

65.     As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages in amount to be determined at trial and attorneys' fees, as provided by N.Y. CLS Civ. S. §75-b.

WHEREFORE, Plaintiffs demand judgment against the Defendant in an amount in excess of the jurisdictional limits of the lower courts, together with the costs and disbursements of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     An award of damages, according to proof, including liquidated damages, to be paid by Defendants;

B.     Penalties available under applicable laws;

C.     Costs of action incurred herein, including expert fees;

D.     Attorneys' fees, including fees pursuant to applicable statutes;

E.     Pre-Judgment and post-judgment interest, as provided by law; and

F.      Such other and further legal and equitable relief as this Court deems necessary,

just and proper.

Dated:   Park Ridge, New Jersey          Respectfully submitted,
         August 11, 2017
                                         KRAKOWER DICHIARA LLC

                                         By:

                                         ___s/ Todd Krakower_____

                                              Todd Krakower

                                         One Depot Square
                                         77 Market Street, Suite 2
                                         Park Ridge, New Jersey 07656
                                         201-746-6333
                                         347-765-1600 (fax)

                                         *Attorneys for Plaintiff*


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

KARINA RODRIGUEZ,

                    Plaintiff,

          - against -

THE CITY OF NEW YORK, ANNE-MARIE
HENDRICKSON, ERIC ENDERLIN, VICTOR
HERNANDEZ, SHATARA PELL, MARGARET
BROWN, LISA TALMA, and JOHN and JANE DOES 1-5
(said names being fictitious, the persons intended being
those who aided and abetted the unlawful conduct of the
named Defendants),

                    Defendants.
----------------------------------------------------------------X

**STIPULATION OF
VOLUNTARY DISMISSAL**

18 Civ. 1626 (ER)

**IT IS HEREBY STIPULATED AND AGREED**, by and between the
parties as represented below, as follows:

      1.   Pursuant to Federal Rule of Civil Procedure Rule 41(a)(1)(A)(ii), all of
Plaintiff's claims in the above-referenced action, are hereby dismissed, with prejudice,
and that an order to that effect may be entered without further notice.

Dated:     New York, New York
           December 19, 2018

**MADUEGBUNA COOPER, LLP**
Attorneys for Plaintiff
30 Wall Street – 8th Floor
New York, New York 10005
Tel: (212) 232-0155
sam.m@mcande.com

By: _____
      Samuel O. Maduegbuna

**ZACHARY W. CARTER**
Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
Tel: (212) 356-4083
emurrell@law.nyc.gov

By: _____
      Eric Murrell
    Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X   **Docket No.:**

KARINA RODRIGUEZ,

                                    Plaintiff,

-against-                                                **COMPLAINT**

                                                         <u>**JURY TRIAL REQUESTED**</u>

THE CITY OF NEW YORK, ANNE-MARIE
HENDRICKSON,   ERIC   ENDERLIN,
VICTOR HERNANDEZ, SHATARA PELL,
MARGARET BROWN, LISA TALMA, and
JOHN and JANE DOES 1-5 (said names being
fictitious, the persons intended being those who
aided and abetted the unlawful conduct of the
named Defendants),

                                    Defendants.
------------------------------------------------------X

        Plaintiff KARINA RODRIGUEZ ("Plaintiff" or "RODRIGUEZ"), by her attorneys,

**MADUEGBUNA COOPER LLP**, complaining of the Defendants, alleges as follows:

**I.      <u>NATURE OF THIS ACTION</u>**

        1.      Plaintiff RODRIGUEZ brings this action to secure protection of and to redress

deprivation of rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42

U.S.C. § 1983 ("Section 1983"), and 42 U.S.C. § 1981, as amended by the Civil Rights Act of

1991, 42 U.S.C. § 1981a ("Section 1981"); the New York State Human Rights Law as contained in

New York State Executive Law, § 296, *et seq*. ("NYSHRL"); and the New York City Human Rights

Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq*.

("NYCHRL"); providing for injunctive relief and other relief against discrimination on the basis of

race, color, and age.

        2.      As part of her employment discrimination claims, Plaintiff RODRIGUEZ was

denied promotions on the basis of race, color, and age. She was retaliated against after

### J. RODRIGUEZ is Further Harassed in Retaliation by Taleporos, HERNANDEZ and PELL

122.   As part of the ongoing hostility towards her, on January 26, 2017, RODRIGUEZ was verbally attacked by former Deputy Director Taleporos who confronted RODRIGUEZ at her desk and instigated a loud argument over policy, yelling and pointing a finger in her face.

123.   RODRIGUEZ, who feared physical harm from the larger male employee blocking her inside a small cubicle, reported the incident to her Union and Defendant HERNANDEZ. But HERNANDEZ brusquely dismissed her concerns.

124.   Instead, on February 16, 2017, RODRIGUEZ was singled out and issued disciplinary charges for the incident relating to her complaints about Taleporos' aggressive behavior. Taleporos, the instigator, faced no charges.

125.   Prior to February 16, 2017, RODRIGUEZ, in her long career with the City and HPD, had never been the subject of disciplinary charges.

126.   On February 10, Defendant HERNANDEZ threatened to mark RODRIGUEZ "absent without leave" for the prior day when RODRIGUEZ had been in the field on an assignment and returned to the office as soon as she was finished.

### K. Defendant PELL Joins HPD

127.   In February 2017, Defendant PELL, a 25-year-old, replaced Cardona as Deputy Director for the Marketing Unit.

128.   Defendant PELL was selected by Defendants HERNANDEZ and HENDRICKSON.

129.   Defendant BROWN also assisted in selecting the less experienced PELL to be Deputy Director over RODRIGUEZ.

130.   RODRIGUEZ did not have the opportunity to apply to the Deputy Director position as it was not reposted or publicly announced before PELL's hiring by Defendants HERNANDEZ, HENDRICKSON, and BROWN.

131.   Upon assuming the position, Defendant PELL would insist that RODRIGUEZ train her to understand the duties of her position and for the sole purpose of learning her job functions from RODRIGUEZ, demanded that RODRIGUEZ copy her on every email, would follow email chains where RODRIGUEZ was communicating with agents, made her sit with her when performing certain tasks, and gave her orders to perform tasks that were not high in priority so PELL could learn how to perform the tasks.

132.   From the beginning of her tenure in the Marketing Unit, Defendant PELL was overly aggressive and heavy handed toward RODRIGUEZ.

133.   From the start of her tenure, PELL also made it clear that she was aware of Plaintiff's discrimination complaints and would join Defendants HERNANDEZ and HENDRICKSON and others in the continuing retaliation and hostile work environment.

**L. PELL Retaliates Against RODRIGUEZ for Opposing Discriminatory Housing Practices**

134.   Since joining the Marketing Unit, Defendant PELL has joined HERNANDEZ in subjecting RODRIGUEZ to abuse and mistreatment not leveled against others in retaliation for her complaints of EEO violations and violations of affordable housing selection process on the basis of race to disadvantage African American housing applicants.

135.   Defendant PELL's abuse and mistreatment of RODRIGUEZ, not otherwise leveled against others, include but are not limited to the following:

(a) Threatening and rejecting RODRIGUEZ's time and leave requests without justification;

(b)  Denying her overtime she worked contrary to unit policy that allows 5 hours of such work without advance notice;

(c) Failing to approve her timesheet resulting in her not receiving her pay check;

(d) Screaming at her to answer the phone even when she was on the phone working;

(e)  Undermining her work decisions;

(f) Sabotaging her work and performance; and

(g) Verbal and physical abuse and general hostility towards her.

136.    Before working for HPD, Defendant PELL worked as an occupancy compliance coordinator for a non-profit agency that works with HPD to provide affordable housing to low and moderate income families (the "developer"). While working for the developer, Defendant PELL would send files for applicants seeking affordable housing subsidized by HPD, such as the Brooklyn Grand project.

137.    As a project manager, RODRIGUEZ reviewed those files to determine final eligibility and regularly emailed with Defendant PELL while she was employed by the developer.

138.    During that time, RODRIGUEZ emailed Defendant PELL about the status of an African American applicant who was eligible for an affordable housing lottery in the Brooklyn Grand project but not processed by Defendant PELL's office.

139.    On her first day working for HPD, February 13, 2017, Defendant PELL questioned RODRIGUEZ's decision regarding the final eligibility of tenants for units in the Brooklyn Grand project, and made clear her intention to reverse those determinations, including for the eligibility of the African American applicant.

140. Defendant PELL was supporting the developer, her former employer, who was improperly rejecting non-Hispanic applicants for units in the project.

141. The African American applicant was eligible and entitled to the unit based on her lottery log number.

142. RODRIGUEZ knew and believed in good-faith, based on her experience with housing law and City rules and policies, that it was impermissible to base lottery decision on race or national origin and that it was improper to deny an African American applicant in favor of a Hispanic applicant who was lower on the list.

143. Beginning in or around February 13, 2017, RODRIGUEZ protested, to no avail, PELL's improper and discriminatory actions of rejecting non-Hispanic applicants for housing units in the Brooklyn Grand project, including the African American applicant.

144. During the same period, RODRIGUEZ also complained and reported to Defendants HERNANDEZ and HENDRICKSON as well as Assistant Commissioner BROWN about PELL's improper and discriminatory refusal to adhere to the tenant selection plan and affordable housing process in order to harm non-Hispanic applicants.

145. Rather than address her concerns, Defendant HERNANDEZ warned RODRIGUEZ to "back down" or she would be removed from the Brooklyn Grand project if she did not reject the African American applicant pursuant to Defendant PELL's instructions

146. In or about May 2017, BROWN told RODRIGUEZ that HERNANDEZ would address the problem and that she did not need to be concerned.

147. In or about May 2017, BROWN also told RODRIGUEZ that HPD Commissioner Maria Torres-Springer was looking into the matter. HERNANDEZ and PELL were both aware of the complaint of RODRIGUEZ to BROWN, and as a result, beginning on or about February

13, 2017, took a number of adverse employment actions against RODRIGUEZ, including denying her promotions, subjecting her to unwarranted discipline, demoting her, physically assaulting her, having her duties reduced to menial clerical tasks, and all her projects reassigned.

148.    On February 15, 2017, at RODRIGUEZ's first one-on-one meeting with Defendant PELL (the "February 15 meeting"), Defendant PELL informed RODRIGUEZ that she was aware of the circumstances under which Cardona, the former deputy director was terminated, and asked RODRIGUEZ if she would have any problems taking direction from a younger "boss."

149.    Following the February 15 meeting, Defendant PELL was constantly trying to sabotage and provoke RODRIGUEZ by ordering her to do something and then reprimanding her for doing so; giving her vague and unclear instructions, and trying to suggest that she did not follow her instructions; luring her into her office to pick-up a document and either reprimanding her for doing so or accusing her of being rude once she is in her office.

150.    After yelling at RODRIGUEZ for days about answering the phones, Defendant PELL sent her a meeting request for February 28, 2017 entitled "Issues" (the "February 28 meeting").

151.    During the February 28 meeting, Defendant PELL falsely accused RODRIGUEZ of always being on her office phone, although she was unsure as to the nature of the calls, and being rude and disrespectful. RODRIGUEZ immediately asked to stop the meeting so she could obtain union representation.

152.    On May 2, 2017, Defendant PELL yelled at RODRIGUEZ unprovoked and threatened to have RODRIGUEZ's time and leave revoked. RODRIGUEZ complained about this incident to Defendant HERNANDEZ, who ignored her complaint.

153.    The following day, May 3, 2017, Defendant PELL issued RODRIGUEZ a disciplinary memorandum, charging her with insubordination for not appearing for a meeting that, in reality, Defendant PELL had never scheduled or issued a request for.

154.    On May 10, 2017, while RODRIGUEZ was speaking with a colleague, Defendant PELL approached the pair and yelled at RODRIGUEZ again in a threatening and abusive tone. RODRIGUEZ also reported this May 10 incident immediately to the disciplinary unit, to no avail.

155.    Since at least February 13, 2017, RODRIGUEZ has also been complaining to Defendant HERNANDEZ and HPD's Disciplinary Unit about PELL's unlawful conduct towards her. However, HPD took no action despite an acknowledgement from the Director of the Disciplinary Unit, Siheem Roseborough, that her claims about being yelled at and humiliated by Defendant PELL were corroborated.

156.    Instead, on May 24, 2017, RODRIGUEZ was called to the Disciplinary Unit to face new charges of insubordination based on Defendant PELL's May 3 memorandum. During this meeting, Investigator Daniel Carcana told RODRIGUEZ that "things are going to get bad for [you]." RODRIGUEZ attempted to follow-up on her complaints regarding Defendant PELL's verbal abuse, again to no avail.

157.    On May 25, 2017, RODRIGUEZ advised a New York City Department of Investigation investigator that Defendants HERNANDEZ and PELL were allowing the developer to violate the lottery process. The investigator said that she would be contacting Defendant HERNANDEZ.

158.    On May 31, 2017, Defendant PELL escalated her abuse to the physical. When RODRIGUEZ was returning to her desk from the copy machine Defendant PELL, who was

walking past, intentionally bumped RODRIGUEZ with her shoulder and sent her falling into filing cabinets. RODRIGUEZ immediately reported the incident to the Disciplinary Unit.

159.    As a result of her EEO complaint and Defendants' continued retaliation, on May 31, 2017, while remaining a staff of the division, RODRIGUEZ was relocated by Defendants HERNANDEZ and PELL and others acting in concert with them, to the Strategic Research Division on another floor, her duties reduced to menial clerical tasks, and all her projects reassigned.

160.    Although RODRIGUEZ was advised she would be a liaison for marketing related issues on the few assignments she received, Defendant HERNANDEZ told her not to speak with his staff or contact the Marketing Unit.

161.    The relocation, which RODRIGUEZ was promised would be temporary for approximately six weeks, until a new, permanent position was established, continues to date.

162.    Presently, RODRIGUEZ has no workload or clear responsibilities and is seated in the Strategic Research Division handling menial work.

163.    In July 2017, RODRIGUEZ filed an online complaint with the New York City Conflicts of Interest Board about the housing lottery violations.

164.    Prior to May 2017, the African American applicant had filed complaints with advocacy groups and was communicating with the HPD Commissioner's office. Ultimately, the attention her file received for being unfairly rejected forced HPD to process her application in accordance with the tenant selection guidelines for the lottery and she was granted an affordable housing unit, in or around July 2017.

c)  Award compensatory damages for all causes of action in amounts that are fair, just and reasonable, to be determined at trial;

d)  Award punitive damages for all causes of action;

e)  Award Plaintiff attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and the NYCHRL;

f)  Award all Plaintiff's costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988, fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and the NYCHRL; and

g)  Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
       February 21, 2018

Respectfully Submitted,

SAMUEL O. MADUEGBUNA (6084)
MADUEGBUNA COOPER LLP
Attorneys for Plaintiff
30 Wall Street, 8th Floor
New York, New York 10005
(212) 232-0155

TO:  **DEFENDANTS**

THE CITY OF NEW YORK
c/o Corporation Counsel
Law Department
100 Church Street
New York, New York 10007

ANNE-MARIE HENDRICKSON
Department of Housing Preservation and Development
100 Gold Street,
New York, New York 10038

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                    *Docket No.:*
-------------------------------------------------------------------------------------------------------------------
*KARINA RODRIGUEZ,*

                                        *Plaintiff,*

            *-against-*

*THE CITY OF NEW YORK, ANNE-MARIE HENDRICKSON, ERIC ENDERLIN, VICTOR HERNANDEZ, SHATARA PELL, MARGARET BROWN, LISA TALMA, and JOHN and JANE DOES 1-5 (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

                                        *Defendants.*
-------------------------------------------------------------------------------------------------------------------

                    *COMPLAINT AND JURY DEMAND*

-------------------------------------------------------------------------------------------------------------------
*Signature (Rule 130-1.1-a)*

_____
*Print name beneath*
*SAMUEL O. MADUEGBUNA, ESQ.*

_____

                          *Yours, etc.*

                *MADUEGBUNA COOPER LLP*
                  *Attorneys for Plaintiff*
                *30 Wall Street, 8th Floor*
                *New York, New York 10005*
                    *(212) 232- 0155*

*To: All Counsel of Record*
_____
*Service of the within is hereby admitted on*
_____
*Attorneys for*